Merrimack
No. 88-502

THE STATE OF NEW HAMPSHIRE

v.

RICHARD CARTIER

May 24, 1990

*John P. Arnold,* attorney general (*Tina Schneider,* assistant attorney general, on the brief and orally), for the State.

*Sakellarios & Associates,* of Manchester (*Jean-Claude Sakellarios* on the brief and orally), for the defendant.

SOUTER, J. The defendant was convicted in the Superior Court (*DiClerico,* J.) of the felony of possessing cocaine with intent to distribute, RSA 318-B:2, I, :26, I(b)(1) (Supp. 1989), and the misdemeanor of possessing marijuana, RSA 318-B:2, I, :26, II(d) (Supp. 1989). Here, he raises claims that the evidence was insufficient to prove possession of either drug or intent to distribute the cocaine; that as a matter of law neither drug was "controlled" at the date of the offenses; and, finally, that the State failed to offer any evidence that either drug was "controlled" so as to subject him to criminal penalties for its possession. We affirm.

On July 13, 1987, the defendant, Richard Cartier, an auto body shop manager, was the lessee of a house in Hooksett, which he occupied with a companion, Joanne Jarosz. When police officers came to the house that afternoon to execute a search warrant unrelated to

the instant charges, Jarosz was away but the defendant was home entertaining three visitors, who left after the police arrived. When one of the police officers walked through the house to see if anyone else was inside, he noticed a glass vial of white powder near a bar, along with two balloons, five paper packaging envelopes known in the drug trade as bindles, a pipe with smoked residue, what appeared to be a ledger or account book, and an open box of rice (used by dealers to mix with drugs to prevent their absorption of moisture). In the adjoining living room the officer noticed another vial of white powder on the floor, and more bindles on a table. Based on this information the police obtained a second warrant, authorizing a search for illicit drugs and associated paraphernalia.

In executing the latter warrant the police found the items mentioned above in the bar area, together with straws, razor blades, a small scoop caked with white powder, a marble cutting block, and a plastic container from a beauty salon containing a mirror, razor blade and straws, known by consumers of drugs as a "user's kit." The police testified at trial that these implements were used to divide, package and ingest drugs, and they described the markings of "one-half" on the bindles as indicating contents of one-half gram. The bar area also yielded firearms, copies of magazines on motorcycles and automotive subjects, and two bindles containing what was later analyzed to be .58 grams of cocaine.

A closet off the bar yielded plastic bags, bowls, a sifter for powder, spoons, more razor blades, a blade dispenser, a scale commonly used to weigh drugs, more envelopes, more vials of powder, papers having notations referring to "rock" and "powder" (said to refer to physical properties of drugs), and a bottle of powder described in testimony as a cutting agent to mix with drugs. In a briefcase bearing the names of a "beauty academy" and of two women not otherwise identified, the police found hundreds of envelopes, a spoon, a sifter, a straw, a scale, and vials of powder residue.

In the living room the officers seized the vial previously observed, which turned out to contain 3.5 grams of cocaine, along with a ceramic tile bearing powder residue, empty envelopes with "one half" markings, a razor blade, and a ten-month-old check for $1,000 payable to Jarosz. Under the couch they found some bags, one of which contained 2.47 grams of marijuana, and a cigarette roller and paper.

In a room furnished with a double bed, they found a vial with cocaine residue on a dresser containing women's clothing. And in the kitchen they seized a "Week-At-A-Glance" planning diary or ledger

containing notations of names and various numbers which the police testified were indicative of drug sales.

These materials were either introduced into evidence or described in testimony, and our account, despite some abbreviation, makes it clear that reasonable jurors could find beyond a reasonable doubt that someone in the defendant's house possessed marijuana and cocaine and was carrying on a business of selling the latter. While it is true that the cocaine and marijuana found in the living room might possibly have been abandoned by the visitors who left when the police arrived, the evidence of other drugs situated elsewhere in the house, and of the quantities of supplies and implements associated with dealership, was sufficient to establish an unmistakable nexus between the house as a dwelling place and the contraband and incriminating evidence discovered within it.

The defendant maintains nonetheless that the evidence, even viewed most favorably to the State, *see State v. Cyr*, 122 N.H. 1155, 1159, 453 A.2d 1315, 1318 (1982), fails to point beyond a reasonable doubt to him, not Jarosz, either as possessor or as dealer. We hold, on the contrary, that the evidence sufficed for his conviction on both scores.

■■ To begin with the issue of possession, its elements in drug cases have been explained before: the State must prove that the defendant knew of the substance's presence in his vicinity, knew of its nature as a drug, and had custody of it, exercising dominion and control. *State v. Comeau*, 114 N.H. 431, 434, 321 A.2d 590, 592 (1974). Since no one testified as an eyewitness to the defendant's handling of the drugs, the State's burden was to prove what our cases have described as his constructive possession. *See State v. Francoeur*, 122 N.H. 386, 387, 445 A.2d 1095, 1096 (1982).

Here there was evidence that anyone living in the house would have known of the presence of the substances in question, since four separate rooms held either containers of one or the other drug or drug residue, or implements or records of use and dispensation. In contrast to the facts, say, in *State v. Fossett*, 119 N.H. 155, 399 A.2d 966 (1979), some of the substances and associated objects were in open view, and it would have been virtually impossible for anyone familiar with the premises to preserve ignorance of incriminating materials so liberally spread about.

Much of the same evidence points to the near impossibility that anyone could have dwelt in the defendant's house without realizing the nature of the substances as drugs, and as illicit. Sifters, razor

blades, straws and bindles are not kept together by law-abiding householders in customary domestic pursuits. Drugs legally possessed come in commercial packaging or pharmacy bottles, not unmarked vials. Unlike marijuana, tea is not normally packaged in unmarked plastic bags, and cooking herbs are not usually kept in living rooms.

That leaves the element of custody, comprising the exercise of dominion and control. As we noted before, since no eyewitness described the defendant's physical handling of the drugs, the State was bound to present evidence sufficient to show this element "constructively," as a right to exercise the incidents of custody. On this point, the defendant rests his hopes on *State v. Fossett*, 119 N.H. 155, 399 A.2d 966, which held proof that a defendant was merely one of two occupants of premises where drugs were found inadequate to demonstrate his constructive possession. *Id.* at 157–58, 399 A.2d at 967–68. The evidence in this case, however, indicates far more than shared occupancy. The defendant was identified as the lessee of the dwelling, with no evidence that any portion of the premises was set aside for Jarosz alone, and no indication that she might have been storing the drugs unbeknownst to him. The defendant's denial that he had dominion and control of the objects within the house flies in the face of his demonstrated legal authority to regulate the activities within the building and the testimony that he was in fact behaving as one with such authority would do. The defendant is likewise off the mark when he tries to avoid the force of this demonstration by resorting to the rule that circumstantial evidence is inadequate to prove possession unless it excludes all other rational conclusions. *See State v. Cyr*, 122 N.H. at 1160, 453 A.2d at 1318. His error lies in supposing that the State was bound to prove that he had exclusive possession, from which it would indeed follow that the case against him was insufficient if the jury could equally well have inferred that Jarosz was also possessing drugs. Proof of joint possession, however, was sufficient for conviction, *see State v. Saide*, 114 N.H. 735, 738–39, 329 A.2d 148, 150 (1974), and the defendant's argument fails accordingly.

His challenge to the sufficiency of the evidence of intent to distribute cocaine fails as well. While it is perfectly true, as he says, and as one of the State's witnesses conceded, that the actual amount of cocaine found in his house might have been held for personal use, proof of intent to distribute does not require some minimum quantity as a matter of law. Not only could the amount shown in this case have

been the residue of a larger supply, *see State v. Grote*, 127 N.H. 748, 750, 506 A.2d 346, 348 (1986), but the other evidence of commercial activity convincingly indicated the possessor's intent to distribute, which the recorded notations found in the bar area and in the planning diary confirmed.

We turn now to the wholly different argument that the defendant could not be validly convicted of any crime in possessing cocaine or marijuana, because on the date charged in 1987 those were not controlled drugs within the meaning of RSA 318-B:2, I (Supp. 1989), the possession of which was criminal and subject to the penalties provided by RSA 318-B:26, I(b)(1) and II(d) (Supp. 1989). The defendant points out that the definition of "controlled drugs" was modified in 1985 to mean any drug, substance or immediate precursor "scheduled pursuant to RSA 318-B:1-a." RSA 318-B:1, VI (Supp. 1989). The session law by which this revision was enacted also established the initial schedules or lists of controlled drugs, by reference to their classifications under federal administrative law. *See* Laws 1985, 293:8, I (incorporating by reference 21 C.F.R. § 1308.11(d)(14) (1989), providing that marijuana is a scheduled I drug); Laws 1985, 293:8, II (incorporating by reference 21 C.F.R. § 1308.12(b)(4) (1989), providing that cocaine falls under schedule II). RSA 318-B: 1-a, I (Supp. 1989) provides that the director of the division of public health services "may add, delete, or reschedule all substances, by rule, pursuant to RSA 541-A . . . ," while RSA 318-B:1-a, VIII (Supp. 1989) requires the director to "revise and republish the schedules in RSA 318-B:1-b semi-annually for 2 years from the effective date of this section, and thereafter annually." RSA 318-B:1-b (Supp. 1989) provides that the director "shall place a substance in" one of five schedules of controlled drugs depending on the characteristics and medicinal properties of the drug in question. The defendant maintains that the director has engaged in no rule-making under RSA chapter 541-A and has published no schedules since the enactment of the 1985 revisions, *see* Laws 1985, 293:10 (effective date August 13, 1985), from which he would infer that there have been no controlled drugs within the meaning of State law since the date of the first failure to republish schedules as required, *i.e.*, February 13, 1986.

■ The defendant goes astray, however, in assuming that republication is required even if the director takes no action to revise the schedules as initially provided by the session law. The definition of "controlled drugs" refers to those drugs scheduled pursuant to § 1-a. As noted above, those schedules were set originally by the legisla-

ture itself. Section 1-a requires revision and republication of "the schedules in RSA 318-B:1-b," which refers only to the schedules in which "the director shall place" a substance. If, then, the director takes no action to modify a schedule as originally provided by the legislature, the obligation to republish the schedule does not arise. Since it is undisputed that the director has not tampered with the original classifications, there is no basis to argue that his failure to republish the schedules has rendered the definition of "controlled drug" devoid of content and the prohibition of RSA 318-B:2, I (Supp. 1989) a nullity.

 Since, in any event, the status of marijuana or cocaine as a controlled drug was an issue of law for the court, there was no occasion to present evidence on these points to the jury, contrary to the defendant's final contention.

*Affirmed.*

All concurred.