USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1082

 NEW HAMPSHIRE HEMP COUNCIL, INC.
 and DEREK OWEN,

 Plaintiffs, Appellants,

 v.

 DONNIE R. MARSHALL, ACTING ADMINISTRATOR,
 UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF NEW HAMPSHIRE

 [Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

 Before

 Selya, Boudin and Lynch,
 
 Circuit Judges,
 
 
 
 Gordon R. Blakeney, Jr. for appellants.
 Dana J. Martin, Appellate Staff, Civil Division, Department of
Justice, with whom David W. Ogden, Acting Assistant Attorney
General, Paul M. Gagnon, United States Attorney, and Mark B. Stern,
Appellate Staff, Civil Division, Department of Justice, were on
brief for appellee.

January 28, 2000

 
 

 BOUDIN, Circuit Judge. This case, which involves the
definition of marijuana as used in federal criminal statutes, has
its origin in a defeated legislative proposal in New Hampshire. 
In 1998, Derek Owen, a member of the New Hampshire state
legislature, co-sponsored a bill to legalize and regulate the
cultivation of "industrial hemp." The connection between the
criminal statutes and Owen's bill is that both the drug commonly
known as marijuana and various industrial products (e.g., rope)
derive from different portions of the plant popularly called the
hemp plant and designated Cannabis sativa in the Linnaean system of
botanical classification. See generally 5 The New Encyclopedia
Britannica 827 (15th ed. 1994).
 In general, the drug is derived from the flowers or
leaves of the plant while the fibers used for rope and other
industrial products are taken from the stalk. Cannabis sativa
plants grown for industrial products generally are cultivated and
mature differently from those intended for the marijuana drug. All
contain THC (a short-hand reference to tetrahydrocannabinol), the
ingredient that gives marijuana its psychoactive or euphoric
properties; but those plants grown for drug use contain a higher
concentration of THC than those grown for most industrial products. 
Owen's bill limited its definition of "industrial hemp" to those
cannabis sativa plants containing a THC concentration of 1 percent
or less.
 Several witnesses testified on Owen's bill before a New
Hampshire house subcommittee. One witness, George Festa, appeared
on behalf of the U.S. Drug Enforcement Administration ("DEA"). He
testified that regardless of intended "industrial" use, the DEA
views the cultivation of cannabis sativa plants as the manufacture
of marijuana and therefore illegal under federal law (absent
federal licensing). Although Owen's bill was thereafter
recommended for passage by the house committee, it was defeated on
a relatively close vote (175 to 164) in the full house on February
6, 1998.
 On April 30, 1998, Owen and the New Hampshire Hemp
Council brought the present action in the federal district court in
New Hampshire against the DEA Administrator. Owen, who farms in
New Hampshire, said that he and the Hemp Council wanted to
cultivate cannabis sativa plants to produce fiber and other
industrial products but were deterred by the DEA's position. The
complaint sought a declaration that in defining "marijuana,"
Congress had not criminalized the growth of "non-psychoactive"
(i.e., low-THC) cannabis sativa as well as an injunction to prevent
the DEA from prosecuting producers. (Other claims were made--for
example, that the Festa testimony violated the plaintiffs' First
Amendment rights--but they are not pursued on this appeal.)
 In May 1998, the magistrate judge held a hearing on the
preliminary relief sought by plaintiffs. After the hearing, which
included testimony from plaintiffs' expert relating to cannabis
sativa, the magistrate judge recommended a denial of the request on
the merits and dismissal of the case for lack of standing. On de
novo review, the district court agreed that there was no standing;
in the course of deciding the standing issue, the district court
also determined that the federal statutory definition of marijuana,
21 U.S.C. 802(16), includes cannabis sativa plants even if grown
solely for the production of industrial products.
 Owen and the Hemp Council now appeal, and we face at the
outset several threshold objections by the government. The first
of these is the claim, seemingly endorsed by the district court,
that the plaintiffs lack standing. Standing, in its Article III
aspect, requires (generally speaking) an actual injury to a
plaintiff traceable to the defendant's conduct and likely to be
redressed by available judicial relief. Lujan v. Defenders of
Wildlife, 504 U.S. 555, 560-61 (1992). The district court reasoned
that since New Hampshire law forbade production of cannabis sativa
for industrial use, Owen could not grow the plants for this
purpose, however the federal statute might be read.
 Some might think this an unseemly argument by the
government. After all, the DEA urged its own reading of the
federal statute on the New Hampshire legislature to defeat, as
fruitless, Owen's effort to legalize "industrial hemp" production
under state law; and now, when a challenge is made by Owen to the
DEA's reading of the federal statute, the DEA points to the
continued existence of New Hampshire's ban as a reason why it is
useless for us to review the DEA's interpretation. Joseph Heller's
phrase "Catch-22" was not intended as a compliment.
 In all events, Article III standing is largely, see 13
Wright, Miller & Cooper, Federal Practice and Procedure 3531.1,
at 352, 362-63 (2d ed. 1984)--albeit not entirely, compare id. at
355-56--a practical jurisprudence. Here, the existing New
Hampshire drug statute is designed, in specifying which drugs are
controlled, to mirror the federal listings. New Hampshire's law
initially defined substances by cross-reference to the then-
existing federal schedules of controlled drugs, see 1985 N.H. Laws
 293:8; State v. Cartier, 575 A.2d 347, 350 (N.H. 1990), but
provided that changes in the federal schedules are to be adopted
automatically, unless a designated state official makes a contrary
ruling after a hearing. See N.H. Rev. Stat. Ann. 318-B:1-a(V)
(1995).
 Thus, if cannabis sativa plants destined for industrial
products were declared not to be marijuana under the federal
statute, this would in due course probably lead to their treatment
as lawful under New Hampshire law under the provision just cited. 
Accordingly, the declaratory relief sought by plaintiffs in this
case as to federal law would as a practical matter likely provide
them with meaningful relief sufficient to support standing under
Article III. This is so without resort to speculation as to
whether Owen's bill would be passed by the state legislature and
would de-link New Hampshire "industrial hemp" regulation entirely
from the federal scheduling scheme.
 The government's other threshold objection is more
conventional. In general, federal courts are disinclined to 
provide either injunctive or declaratory relief to foreclose
federal criminal prosecutions in the absence of a reasonably clear
and specific threat of prosecution. See 13A Wright, Miller &
Cooper, supra, 3532.5, at 175-80 (2d ed. 1984). This doctrine,
which is often referred to as a standing requirement, is probably
more complex in character, involving as well concerns about
ripeness and the exercise of equitable discretion, id. at 189-91;
but in all events the cautionary approach is well established,
although somewhat relaxed where First Amendment interests are
threatened. See, e.g., Meese v. Keene, 481 U.S. 465, 473 (1987). 
 Nevertheless, just how clear the threat of prosecution
needs to be turns very much on the facts of the case and on a
sliding-scale judgment that is very hard to calibrate. It is true,
as the government says, that some cases have seemed to draw a line
between a general threat to the world and a specific threat to an
individual, see 13A Wright, Miller & Cooper, supra, 3532.5, at
176-77, but in yet other cases the courts are content with any
realistic inferences that show a likelihood of prosecution, id. at
179-80. There may be a trend in favor of such a practical
approach, see, e.g., Mobil Oil Corp. v. Attorney General of
Virginia, 940 F.2d 73, 75-76 (4th Cir. 1991); Hejira Corp. v.
MacFarlane, 660 F.2d 1356, 1360 (10th Cir. 1981), which Wright and
Miller strongly endorse. See 13A Wright, Miller & Cooper, supra,
 3532.5, at 180-84.
 Little risk exists that courts will be flooded with
untoward pre-enforcement challenges; most issues in criminal cases
turn on multiple facts that cannot be taken in isolation or
definitively known in advance. Even where a statute appears to
make conduct criminal, an unambiguous disclaimer of coverage by the
prosecutor is likely to suffice. Cf. Rhode Island Ass'n of
Realtors, Inc. v. Whitehouse, No. 99-1812, 1999 WL 1128676, at *5-6
(1st Cir. Dec. 14, 1999). And, because declaratory and injunctive
relief is discretionary, Reno v. Catholic Soc. Servs., 509 U.S. 43,
57 (1993), there is plenty of room for courts to deny improvident
requests even if there is an otherwise ripe case and a realistic
threat of prosecution.
 We think that the threat of federal prosecution here is
realistic. Owen, a farmer as well as a legislator, proposes to
grow cannabis sativa plants to produce industrial products if
permitted to do so. The DEA has made clear, both by its conduct in
New Hampshire and elsewhere, that it views this as unlawful under
the federal criminal statutes governing marijuana. A recent DEA
ruling, reflected in the Federal Register, takes the same view. 
See Hemp Products Research Co., 63 Fed. Reg. 260, 261 (1998). Nor,
as the medical-use controversy bears out, see United States v.
Oakland Cannabis Buyers' Cooperative, 190 F.3d 1109 (9th Cir.
1999), is there any reason to doubt the government's zeal in
suppressing any activity it regards as fostering marijuana use. 
 As for ripeness, the issue posed by Owen is an abstract
one of statutory interpretation: whether the federal statute makes
criminal the production of cannabis sativa for use in making
industrial products. And the DEA's emphatic position equitably
argues for review--not because there is anything wrong with the
agency expressing its view but because, that view having been
expressed, there ought to be a way to resolve the legal correctness
of its position without subjecting an honest businessman to
criminal penalties well known for their severity and inflexible
administration. See generally 13A Wright, Miller, & Cooper, supra,
 3532.5, at 183-84.
 The DEA points out that it can license marijuana
production, see 21 U.S.C. 822-23; 28 C.F.R. 0.100(b) (1999),
and that Owen has not sought a license. But whether viewed as a
ripeness objection or one based on a failure to exhaust remedies,
the objection is unsound here, even if there were some realistic
prospect of a license for Owen. Owen's position is that his
proposed production of industrial products is not marijuana
production under the statute and therefore not subject to the
statute at all, whether as a prohibition or licensing scheme. If
he were correct, it is hard to see why he should be forced to apply
for a license. Cf. Leedom v. Kyne, 358 U.S. 184, 188-89 (1958).
 This is quite an excursion, although one not easy to
avoid so far as it concerns an Article III standing objection, see
Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93-102
(1998), for a case that is fairly easy on the merits. For purposes
of the federal criminal statutes, "marijuana" is defined--not by
the DEA but by Congress--as follows:
 [A]ll parts of the plant Cannabis sativa L.,
 whether growing or not; the seeds thereof; the
 resin extracted from any part of such plant;
 and every compound, manufacture, salt,
 derivative, mixture, or preparation of such
 plant, its seeds or resin. Such term does not
 include the mature stalks of such plant, fiber
 produced from such stalks, oil or cake made
 from the seeds of such plant, any other
 compound, manufacture, salt, derivative,
 mixture, or preparation of such mature stalks
 (except the resin extracted therefrom), fiber,
 oil, or cake, or the sterilized seed of such
 plant which is incapable of germination.

21 U.S.C. 802(16)(emphasis added).
 Owen's own complaint concedes that the industrial
products at issue are produced from plants of the "species"
cannabis sativa; strictly speaking, "cannabis" is the genus and
"sativa" is the species, see Honneus, 508 F.2d at 574, and the "L."
in the statute simply refers to Linnaeus' system of botanical
classification, see United States v. King, 485 F.2d 353, 360-61
(10th Cir. 1973). Owen's own expert admitted at the preliminary-
relief hearing that the plant from which the industrial products
are derived is cannabis sativa. The literature to which Owen cites
in the complaint says the same thing. In short, on a literal
reading of the statute, the plant--which is what Owen proposes to
grow--is within the statute's ban.
 Statutory language is the starting point in statutory
interpretation, e.g., Schreiber v. Burlington Northern, Inc., 472
U.S. 1, 5 (1985), and, without getting into refinements on which
even the Supreme Court is divided, see, e.g., Sullivan v.
Finkelstein, 496 U.S. 617, 628 n.8 (1990); id. at 631-62 (Scalia,
J., concurring in part), it is the ending point unless there is a
sound reason for departure, see Robinson v. Shell Oil Co., 519 U.S.
337, 340 (1997). Here, nothing in Owen's complaint or arguments
warrants a narrower reading, nor have somewhat similar arguments
persuaded the several other circuits in which they have been
advanced, in attempts to carve out various exceptions for cannabis
sativa plants with low THC levels. We take Owen's key arguments
one by one.
 Owen's main argument is that plants produced for
industrial products contain very little of the psychoactive
substance THC. However, the low THC content is far from
conclusive. See, e.g., United States v. Proyect, 989 F.2d 84, 87-
88 (2d Cir.), cert. denied, 510 U.S. 822 (1993); United States v.
Spann, 515 F.2d 579, 583-84 (10th Cir. 1975). It may be that at
some stage the plant destined for industrial products is useless to
supply enough THC for psychoactive effects. But problems of
detection and enforcement easily justify a ban broader than the
psychoactive variety of the plant. Owen's own expert testified at
the preliminary hearing that young cannabis sativa plants with
varying psychoactive properties are visually indistinguishable. 
And the statute does not distinguish among varieties of cannabis
sativa.
 Owen's best argument stems from legislative history. The
present definition of marijuana was first employed in the Marihuana
Tax Act of 1937, 50 Stat. 551. There, the basic definition covered
all cannabis sativa plants whether intended for industrial use or
drug production, id. at 1(b), see also S. Rep. No. 75-900, at 4
(1937), but the statute effectively distinguished between them by
taxing them differently. All producers of cannabis sativa and
certain legitimate users (e.g., doctors) were subject to a small
tax, ($1 per year), Marihuana Tax Act 2(a), 50 Stat. at 552; see
also S. Rep. No. 75-900, at 4, but no tax was applied to transfers
of the mature stalk of the plant, which is useful only for
industrial use, S. Rep. No. 75-900, at 4, and which was
specifically excluded from the definition of "marijuana," Marihuana
Tax Act 1(b), 50 Stat. at 551.
 By contrast, to discourage "illicit" uses, an extremely
high tax ($100) applied to each transfer of other parts of the
plant to anyone who had not registered with the government and paid
his own occupational tax. Marihuana Tax Act 6, 7(a)(2), 50
Stat. at 553-54. And while the scheme permitted producers and
legitimate customers to register (e.g., doctors, researchers), id.
 2, 50 Stat. at 551-52, it made no explicit provision for
registration by most consumers (except to exempt entirely patients
receiving marijuana by medical prescription, id. 6(b), 50 Stat.
at 553). Transfers that did not comply were made criminal. Id. 
4, 8, 12, 50 Stat. at 553, 555, 556. See generally S. Rep. No. 75-
900; Smith v. United States, 269 F.2d 217, 218-20 (D.C. Cir.), cert
denied, 361 U.S. 865 (1959).
 In 1970 Congress adopted the Controlled Substances Act,
84 Stat. 1242 (codified at 21 U.S.C. 801 et seq.), repealing the
1937 tax statute, 84 Stat. at 1291-92, but carrying forward its
definition of marijuana into the present criminal ban on
production, sale and possession, see note 3 above; United States v.
Walton, 514 F.2d 201, 203 (D.C. Cir. 1975). While in 1937 Congress
had indicated in legislative history that production for industrial
uses would be protected (primarily by a relatively low tax), see S.
Rep. No. 75-900, at 4; Smith, 269 F.2d at 218-20, we can find no
indication that Congress in 1970 gave any thought to how its new
statutory scheme would affect such production.
 Given the 1937 intent to protect industrial uses and the
carrying forward of the definition, Owen colorably argues that the
1970 statute should also be read to protect production for
industrial uses by interpolating his distinction between
psychoactive and non-psychoactive strains of cannabis sativa. The
difficulty is that Congress' main vehicle for protecting
industrial-use plant production in 1937 was not its basic
definition of "marijuana," which included plants ultimately
destined for industrial use; it was the complex scheme of
differential tax rates and other requirements for transfers. That
is the regime that was drastically modified in 1970 in favor of a
broad criminal ban (subject only to federal licensing), a ban which
read literally embraces production of cannabis sativa plants
regardless of use.
 The possibility remains that Congress would not have
adopted the 1970 statute in its present form if it had been aware
of the effect on cultivation of plants for industrial uses. But
that is only a possibility and not a basis for reading the new
statute contrary to its literal language, see Robinson, 519 U.S. at
340, at least absent a clear indication that Congress intended to
protect plant production for industrial use as it existed under the
prior tax statute. Nor, given Congress' enlargement of drug crimes
and penalties in recent years, would one bank on its adoption of an
exception strongly opposed by the DEA as constituting a threatened
loophole in the ban on illegal drugs.
 Owen hints at one other argument that cries out to be
addressed. In a number of cases, the courts have extended the 1970
statute--arguably beyond its literal language--to embrace not only
the sativa species of cannabis but what may (or may not) be several 
other cannabis species. The courts found that these plants can
provide the same level of THC as cannabis sativa grown for drug
use, expressed doubts that they are (or at least were regarded by
Congress as) species distinct from sativa, and felt confident that
Congress did not mean to distinguish among related major THC
agents. E.g., Honneus, 508 F.2d at 574-75.
 If plants arguably beyond the literal language of the
statute are condemned because of their THC content, this gives Owen
some basis for contending that plants within the literal language
should be excluded based on their (comparative) lack of THC
content. But the symmetry is misleading. Reading the statute to
cover other possible species rests (as just noted) on a number of
grounds--not just THC content. By contrast, where cannabis sativa
plants are grown for industrial use, the statute's coverage is
supported alike by literal language, enforcement concerns and the
broad application of the definition under the 1937 tax statute.
 Despite the myth that Congress intends every result
entailed by its statutes, new laws are often like jigsaw puzzles
whose pieces do not quite fit; some have to be squeezed into place
and there may be gaps in the pattern. But in this instance, on the
issue of whether the statute includes all cannabis sativa plants,
the considerations favor a literal reading of the statute and
preclude Owen's construction.
 Affirmed.