NEW HAMPSHIRE HEMP COUNCIL, INC. and Derek Owen, Plaintiffs, Appellants,

v.

Donnie R. MARSHALL, Acting Administrator, United States Drug Enforcement Administration, Defendant, Appellee.

No. 99–1082.

United States Court of Appeals, First Circuit.

Heard Dec. 6, 1999.

Decided Jan. 28, 2000.

Gordon R. Blakeney, Jr., for appellants.

Dana J. Martin, Appellate Staff, Civil Division, Department of Justice, with whom David W. Ogden, Acting Assistant Attorney General, Paul M. Gagnon, United States Attorney, and Mark B. Stern, Appellate Staff, Civil Division, Department of Justice, were on brief, for appellee.

Before SELYA, BOUDIN and LYNCH, Circuit Judges.

BOUDIN, Circuit Judge.

This case, which involves the definition of marijuana as used in federal criminal statutes, has its origin in a defeated legislative proposal in New Hampshire.[1] In 1998, Derek Owen, a member of the New Hampshire state legislature, co-sponsored a bill to legalize and regulate the cultivation of "industrial hemp." The connection between the criminal statutes and Owen's bill is that both the drug commonly known as marijuana and various industrial products (*e.g.,* rope) derive from different portions of the plant popularly called the hemp plant and designated *Cannabis sativa* in the Linnaean system of botanical classification.[2]

In general, the drug is derived from the flowers or leaves of the plant while the fibers used for rope and other industrial products are taken from the stalk. Cannabis sativa plants grown for industrial products generally are derived from different strains and are cultivated and mature differently from those intended for the marijuana drug. All contain THC (a shorthand reference to tetrahydrocannabinol), the ingredient that gives marijuana its psychoactive or euphoric properties; but those plants grown for drug use contain a higher concentration of THC than those grown for most industrial products. Owen's bill limited its definition of "industrial hemp" to those cannabis sativa plants containing a THC concentration of 1 percent or less.[3]

Several witnesses testified on Owen's bill before a New Hampshire house subcommittee. One witness, George Festa, appeared on behalf of the U.S. Drug Enforcement Administration ("DEA"). He testified that regardless of intended "industrial" use, the DEA views the cultivation of cannabis sativa plants as the manufacture of marijuana and therefore illegal under federal law (absent federal licensing).[4] Although Owen's bill was thereafter recommended for passage by the house committee, it was defeated on a relatively close vote (175 to 164) in the full house on February 6, 1998.

On April 30, 1998, Owen and the New Hampshire Hemp Council brought the present action in the federal district court in New Hampshire against the DEA Administrator. Owen, who farms in New Hampshire, said that he and the Hemp Council wanted to cultivate cannabis sativa plants to produce fiber and other industrial products but were deterred by the DEA's position. The complaint sought a declaration that in defining "marijuana," Congress

---

1. Federal statutes use the spelling "marihuana," but for uniformity we substitute the more popular spelling. In legal discourse, the term is variously used, sometimes to refer to the statutory definition, sometimes to the drug, and sometimes to the plant from which the drug is derived, so the reader must be alert to context.

2. *See generally* Amala Raman, *The Cannabis Plant, in Cannabis* 29, 32 (David T. Brown ed., 1998); Robert Connell Clarke, *Marijuana Botany* 159–60 (1981); John Taylor, *Nomenclatural Nonsense and Legal Marihuana Plants, in The Species Problem in Cannabis: Science & Semantics* 96, 97–99 (Ernest Small ed., 1979), 5 *The New Encyclopedia Britannica* 827 (15th ed. 1994).

3. For scientific background, see *United States v. Walton,* 514 F.2d 201, 202–04 (D.C.Cir. 1975); *United States v. Honneus,* 508 F.2d 566, 574–75 (1st Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975), *and overruled on other grounds by United States v. Christensen,* 732 F.2d 20, 23 n. 5 (1st Cir.1984).

4. Federal law makes it unlawful *inter alia* to "manufacture" a "controlled substance," 21 U.S.C. § 841(a)(1); "controlled substance" includes any substance listed in specified schedules, *id.* § 802(6); one such schedule lists "marijuana," *id.* § 812(c); and "marijuana" is elaborately defined as discussed below, *id.* § 802(16).

had not criminalized the growth of "non-psychoactive" (*i.e.,* low-THC) cannabis sativa as well as an injunction to prevent the DEA from prosecuting producers. (Other claims were made—for example, that the Festa testimony violated the plaintiffs' First Amendment rights—but they are not pursued on this appeal.)

In May 1998, the magistrate judge held a hearing on the preliminary relief sought by plaintiffs. After the hearing, which included testimony from plaintiffs' expert relating to cannabis sativa, the magistrate judge recommended a denial of the request on the merits and dismissal of the case for lack of standing. On *de novo* review, the district court agreed that there was no standing; in the course of deciding the standing issue, the district court also determined that the federal statutory definition of marijuana, 21 U.S.C. § 802(16), includes cannabis sativa plants even if grown solely for the production of industrial products.

■■ Owen and the Hemp Council now appeal, and we face at the outset several threshold objections by the government. The first of these is the claim, seemingly endorsed by the district court, that the plaintiffs lack standing. Standing, in its Article III aspect, requires (generally speaking) an actual injury to a plaintiff traceable to the defendant's conduct and likely to be redressed by available judicial relief. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The district court reasoned that since New Hampshire law forbade production of cannabis sativa for industrial use, Owen could not grow the plants for this purpose, however the federal statute might be read.

Some might think this an unseemly argument by the government. After all, the DEA urged its own reading of the federal statute on the New Hampshire legislature to defeat, as fruitless, Owen's effort to legalize "industrial hemp" production under state law; and now, when a challenge is made by Owen to the DEA's reading of the federal statute, the DEA points to the continued existence of New Hampshire's ban as a reason why it is useless for us to review the DEA's interpretation. Joseph

Heller's phrase "Catch–22" was not intended as a compliment.

■ In all events, Article III standing is largely, *see* 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.1, at 352, 362–63 (2d ed.1984)—albeit not entirely, *compare id.* at 355–56—a practical jurisprudence. Here, the existing New Hampshire drug statute is designed, in specifying which drugs are controlled, to mirror the federal listings. New Hampshire's law initially defined substances by cross-reference to the then-existing federal schedules of controlled drugs, *see* 1985 N.H. Laws § 293:8; *State v. Cartier,* 133 N.H. 217, 575 A.2d 347, 350 (N.H.1990), but provided that changes in the federal schedules are to be adopted automatically, unless a designated state official makes a contrary ruling after a hearing. *See* N.H.Rev.Stat. Ann. § 318–B:1–a(V) (1995).

Thus, if cannabis sativa plants destined for industrial products were declared not to be marijuana under the federal statute, this would in due course probably lead to their treatment as lawful under New Hampshire law under the provision just cited. Accordingly, the declaratory relief sought by plaintiffs in this case as to federal law would as a practical matter likely provide them with meaningful relief sufficient to support standing under Article III. This is so without resort to speculation as to whether Owen's bill would be passed by the state legislature and would de-link New Hampshire "industrial hemp" regulation entirely from the federal scheduling scheme.

■■ The government's other threshold objection is more conventional. In general, federal courts are disinclined to provide either injunctive or declaratory relief to foreclose federal criminal prosecutions in the absence of a reasonably clear and specific threat of prosecution. *See* 13A Wright, Miller & Cooper, *supra,* § 3532.5, at 175–80 (2d ed.1984). This doctrine, which is often referred to as a

standing requirement, is probably more complex in character, involving as well concerns about ripeness and the exercise of equitable discretion, *id.* at 189–91; but in all events the cautionary approach is well established, although somewhat relaxed where First Amendment interests are threatened. *See, e.g., Meese v. Keene,* 481 U.S. 465, 473, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987).

■ Nevertheless, just how clear the threat of prosecution needs to be turns very much on the facts of the case and on a sliding-scale judgment that is very hard to calibrate. It is true, as the government says, that some cases have seemed to draw a line between a general threat to the world and a specific threat to an individual, *see* 13A Wright, Miller & Cooper, *supra,* § 3532.5, at 176–77, but in yet other cases the courts are content with any realistic inferences that show a likelihood of prosecution, *id.* at 179–80. There may be a trend in favor of such a practical approach, *see, e.g., Mobil Oil Corp. v. Attorney General of Virginia,* 940 F.2d 73, 75–76 (4th Cir.1991); *Hejira Corp. v. MacFarlane,* 660 F.2d 1356, 1360 (10th Cir.1981), which Wright and Miller strongly endorse. *See* 13A Wright, Miller & Cooper, *supra,* § 3532.5, at 180–84.

■ Little risk exists that courts will be flooded with untoward pre-enforcement challenges; most issues in criminal cases turn on multiple facts that cannot be taken in isolation or definitively known in advance. Even where a statute appears to make conduct criminal, an unambiguous disclaimer of coverage by the prosecutor is likely to suffice. *Cf. Rhode Island Ass'n of Realtors, Inc. v. Whitehouse,* 199 F.3d 26, 31–33 (1st Cir.1999). And, because declaratory and injunctive relief is discretionary, *Reno v. Catholic Soc. Servs.,* 509 U.S. 43, 57, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), there is plenty of room for courts to deny improvident requests even if there is an otherwise ripe case and a realistic threat of prosecution.

■ We think that the threat of federal prosecution here is realistic. Owen, a farmer as well as a legislator, proposes to grow cannabis sativa plants to produce industrial products if permitted to do so. The DEA has made clear, both by its conduct in New Hampshire and elsewhere, that it views this as unlawful under the federal criminal statutes governing marijuana. A recent DEA ruling, reflected in the Federal Register, takes the same view. *See Hemp Products Research Co.,* 63 Fed. Reg. 260, 261 (1998). Nor, as the medical-use controversy bears out, *see United States v. Oakland Cannabis Buyers' Cooperative,* 190 F.3d 1109 (9th Cir.1999), is there any reason to doubt the government's zeal in suppressing any activity it regards as fostering marijuana use.

■ As for ripeness, the issue posed by Owen is an abstract one of statutory interpretation: whether the federal statute makes criminal the production of cannabis sativa for use in making industrial products. And the DEA's emphatic position equitably argues for review—not because there is anything wrong with the agency expressing its view but because, that view having been expressed, there ought to be a way to resolve the legal correctness of its position without subjecting an honest businessman to criminal penalties well known for their severity and inflexible administration. *See generally* 13A Wright, Miller, & Cooper, *supra,* § 3532.5, at 183–84.

■ The DEA points out that it can license marijuana production, *see* 21 U.S.C. §§ 822–23; 28 C.F.R. § 0.100(b) (1999), and that Owen has not sought a license. But whether viewed as a ripeness objection or one based on a failure to exhaust remedies, the objection is unsound here, even if there were some realistic prospect of a license for Owen. Owen's position is that his proposed production of industrial products is not marijuana production under the statute and therefore not subject to the statute at all, whether as a prohibition or licensing scheme. If he were correct, it is hard to see why he should be

forced to apply for a license. *Cf. Leedom v. Kyne,* 358 U.S. 184, 188–89, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

■ This is quite an excursion, although one not easy to avoid so far as it concerns an Article III standing objection, *see Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 93–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), for a case that is fairly easy on the merits. For purposes of the federal criminal statutes, "marijuana" is defined—not by the DEA but by Congress—as follows:

> [A]ll parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. *Such term does not include the mature stalks of such plant, fiber produced from such stalks,* oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16)(emphasis added).

Owen's own complaint concedes that the industrial products at issue are produced from plants of the "species" cannabis sativa; strictly speaking, "cannabis" is the genus and "sativa" is the species, *see Honneus,* 508 F.2d at 574, and the "L." in the statute simply refers to Linnaeus' system of botanical classification, *see United States v. King,* 485 F.2d 353, 360–61 (10th Cir.1973). Owen's own expert admitted at the preliminary-relief hearing that the plant from which the industrial products are derived is cannabis sativa. The literature to which Owen cites in the complaint says the same thing. In short, on a literal reading of the statute, the plant—which is

what Owen proposes to grow—is within the statute's ban.

■ Statutory language is the starting point in statutory interpretation, *e.g., Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 5, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985), and, without getting into refinements on which even the Supreme Court is divided, *see, e.g., Sullivan v. Finkelstein,* 496 U.S. 617, 628 n. 8, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990); *id.* at 631–62, 110 S.Ct. 2658 (Scalia, J., concurring in part), it is the ending point unless there is a sound reason for departure, *see Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Here, nothing in Owen's complaint or arguments warrants a narrower reading, nor have somewhat similar arguments persuaded the several other circuits in which they have been advanced, in attempts to carve out various exceptions for cannabis sativa plants with low THC levels.[5] We take Owen's key arguments one by one.

Owen's main argument is that plants produced for industrial products contain very little of the psychoactive substance THC. However, the low THC content is far from conclusive. *See, e.g., United States v. Proyect,* 989 F.2d 84, 87–88 (2d Cir.), *cert. denied,* 510 U.S. 822, 114 S.Ct. 80, 126 L.Ed.2d 49 (1993); *United States v. Spann,* 515 F.2d 579, 583–84 (10th Cir. 1975). It may be that at some stage the plant destined for industrial products is useless to supply enough THC for psychoactive effects. But problems of detection and enforcement easily justify a ban broader than the psychoactive variety of the plant. Owen's own expert testified at the preliminary hearing that young cannabis sativa plants with varying psychoactive properties are visually indistinguishable. And the statute does not distinguish among varieties of cannabis sativa.

---

**5.** *See United States v. Traynor,* 990 F.2d 1153, 1160 (9th Cir.1993); *United States v. Proyect,* 989 F.2d 84, 87–88 (2d Cir.), *cert. denied,* 510 U.S. 822, 114 S.Ct. 80, 126 L.Ed.2d 49 (1993); *United States v. Curtis,* 965 F.2d 610, 615–16 (8th Cir.1992); *United States v. Spann,* 515 F.2d 579, 583–84 (10th Cir.1975).

Owen's best argument stems from legislative history. The present definition of marijuana was first employed in the Marihuana Tax Act of 1937, 50 Stat. 551. There, the basic definition covered all cannabis sativa plants whether intended for industrial use or drug production, *id.* at § 1(b), *see also* S.Rep. No. 75–900, at 4 (1937), but the statute effectively distinguished between them by taxing them differently. All producers of cannabis sativa and certain legitimate users (*e.g.*, doctors) were subject to a small tax, ($1 per year), Marihuana Tax Act § 2(a), 50 Stat. at 552; *see also* S.Rep. No. 75–900, at 4, but no tax was applied to transfers of the *mature* stalk of the plant, which is useful only for industrial use, S.Rep. No. 75–900, at 4, and which was specifically excluded from the definition of "marijuana," Marihuana Tax Act § 1(b), 50 Stat. at 551.

By contrast, to discourage "illicit" uses, an extremely high tax ($100) applied to *each* transfer of other parts of the plant to anyone who had not registered with the government and paid his own occupational tax. Marihuana Tax Act §§ 6, 7(a)(2), 50 Stat. at 553–54. And while the scheme permitted producers and legitimate customers to register (*e.g.*, doctors, researchers), *id.* § 2, 50 Stat. at 551–52, it made no explicit provision for registration by most consumers (except to exempt entirely patients receiving marijuana by medical prescription, *id.* § 6(b), 50 Stat. at 553). Transfers that did not comply were made criminal. *Id.* §§ 4, 8, 12, 50 Stat. at 553, 555, 556. *See generally* S.Rep. No. 75–900; *Smith v. United States*, 269 F.2d 217, 218–20 (D.C.Cir.), *cert denied*, 361 U.S. 865, 80 S.Ct. 130, 4 L.Ed.2d 108 (1959).

In 1970 Congress adopted the Controlled Substances Act, 84 Stat. 1242 (codified at 21 U.S.C. § 801 *et seq.*), repealing the 1937 tax statute, 84 Stat. at 1291–92, but carrying forward its definition of marijuana into the present criminal ban on production, sale and possession, *see* note 3

above; *United States v. Walton*, 514 F.2d 201, 203 (D.C.Cir.1975). While in 1937 Congress had indicated in legislative history that production for industrial uses would be protected (primarily by a relatively low tax), *see* S.Rep. No. 75–900, at 4; *Smith*, 269 F.2d at 218–20, we can find no indication that Congress in 1970 gave any thought to how its new statutory scheme would affect such production.

Given the 1937 intent to protect industrial uses and the carrying forward of the definition, Owen colorably argues that the 1970 statute should also be read to protect production for industrial uses by interpolating his distinction between psychoactive and non-psychoactive strains of cannabis sativa. The difficulty is that Congress' main vehicle for protecting industrial-use plant production in 1937 was not its basic definition of "marijuana," which included plants ultimately destined for industrial use; it was the complex scheme of differential tax rates and other requirements for transfers. That is the regime that was drastically modified in 1970 in favor of a broad criminal ban (subject only to federal licensing), a ban which read literally embraces production of cannabis sativa plants regardless of use.[6]

The possibility remains that Congress would not have adopted the 1970 statute in its present form if it had been aware of the effect on cultivation of plants for industrial uses. But that is only a *possibility* and not a basis for reading the new statute contrary to its literal language, *see Robinson*, 519 U.S. at 340, 117 S.Ct. 843, at least absent a clear indication that Congress intended to protect plant production for industrial use as it existed under the prior tax statute. Nor, given Congress' enlargement of drug crimes and penalties in recent years, would one bank on its adoption of an exception strongly opposed by the DEA as constituting a threatened loophole in the ban on illegal drugs.

6. Of course, stalks and fiber can still be possessed, *see Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 355, 104 S.Ct. 1837, 80 L.Ed.2d 356 (1984) (noting that hemp fibers are not grown in the United States but can be imported), but that is because of the explicit carveout contained in the statute and underscored above.

8

Owen hints at one other argument that cries out to be addressed. In a number of cases, the courts have extended the 1970 statute—arguably beyond its literal language—to embrace not only the sativa species of cannabis but what may (or may not) be several other cannabis species.[7] The courts found that these plants can provide the same level of THC as cannabis sativa grown for drug use, expressed doubts that they are (or at least were regarded by Congress as) species distinct from sativa, and felt confident that Congress did not mean to distinguish among related major THC agents. *E.g., Honneus,* 508 F.2d at 574–75.

If plants arguably beyond the literal language of the statute are condemned because of their THC content, this gives Owen some basis for contending that plants within the literal language should be excluded based on their (comparative) lack of THC content. But the symmetry is misleading. Reading the statute to cover other possible species rests (as just noted) on a number of grounds—not just THC content. By contrast, where cannabis sativa plants are grown for industrial use, the statute's coverage is supported alike by literal language, enforcement concerns and the broad application of the definition under the 1937 tax statute.

Despite the myth that Congress intends every result entailed by its statutes, new laws are often like jigsaw puzzles whose pieces do not quite fit; some have to be squeezed into place and there may be gaps in the pattern. But in this instance, on the issue of whether the statute includes all cannabis sativa plants, the considerations favor a literal reading of the statute and preclude Owen's construction.

*Affirmed.*

---

7. *See United States v. Kelly,* 527 F.2d 961, 964 (9th Cir.1976); *United States v. Gavic,* 520 F.2d 1346, 1352 & n. 9 (8th Cir.1975); *Spann,* 515 F.2d at 581–82; *Walton,* 514 F.2d at 202–04; *Honneus,* 508 F.2d at 574–75.