# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1654

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Alexander "Alex" White Plume; | * | |
| Percy White Plume, their agents, | * | |
| servants, assigns, attorneys, and all | * | |
| others acting in concert with the | * | Appeals from the United States |
| named defendants, | * | District Court for the District |
| | * | of South Dakota. |
| Defendants-Appellants, | * | |
| | * | |
| Tierra Madre, LLC, a Delaware | * | |
| limited liability company; Madison | * | |
| Hemp and Flax Company 1806, Inc., | * | |
| a Kentucky corporation, | * | |
| | * | |
| Intervenor Defendant. | * | |
| | * | |
| | * | |
| Owe Aku Tiospaye; Indigenous Law | * | |
| Institute; Institute for Cultural Ecology; | * | |
| Oglala Sioux Tribe; The Hemp | * | |
| Industries Association; Vote Hemp, | * | |
| | * | |
| Amici on behalf of | * | |
| Appellants. | * | |

_____

No. 05-1656
_____

| United States of America, | * |
| | * |
| Plaintiff-Appellee, | * |
| | * |
| v. | * |
| | * |
| Alexander "Alex" White Plume; | * |
| Percy White Plume, their agents, | * |
| servants, assigns, attorneys, and all | * |
| others acting in concert with the | * |
| named defendants, | * |
| | * |
| Defendants, | * |
| | * |
| Tierra Madre, LLC, a Delaware | * |
| limited liability company; Madison | * |
| Hemp and Flax Company 1806, Inc., | * |
| a Kentucky corporation, | * |
| | * |
| Intervenor Defendant- | * |
| Appellants. | * |
| _____ | * |
| | * |
| Owe Aku Tiospaye; Indigenous Law | * |
| Institute; Institute for Cultural Ecology; | * |
| Oglala Sioux Tribe; The Hemp | * |
| Industries Association; Vote Hemp, | * |
| | * |
| Amici on behalf of | * |
| Appellants. | * |

Submitted: December 12, 2005
Filed: May 17, 2006

_____

Before BYE, BEAM, and GRUENDER, Circuit Judges.

_____

BEAM, Circuit Judge.

Alex and Percy White Plume, members of the Oglala Sioux Tribe (Tribe) on the Pine Ridge Indian Reservation, and Tierra Madre, LLC and Madison Hemp and Flax Company 1806, Inc. (the Companies), (collectively, "Appellants") appeal the district court's[1] grant of summary judgment in favor of the United States. We affirm.

## I.     BACKGROUND

In 1998, the Tribe Council passed tribal ordinance number 98-27 which amended the Oglala Sioux Tribal Penal Code, Title 9, Section 106 (Marijuana) and Section 106.00 (Controlled Drugs and Substances). The amendment to Title 9, Section 106 provided for a sentence of labor not to exceed six months, or a fine not to exceed $360, or both, for any Indian who farmed, gathered, or dealt in marijuana. Section 106(e), which defines "marijuana" for purposes of the penal code, was amended to exclude all parts of the Cannabis plant that contain less than one percent of the chemical tetrahydrocannabinol (THC) by weight. The amended ordinance specifically excluded "industrial hemp" by definition. A definition of industrial hemp was added to section 106.00, describing it as

_____

[1]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

[a]ll parts and varieties of the plant *Cannabis sativa*, both indigenous and imported, that are, or have historically been, cultivated and harvested for fiber and seed purposes and contain a tetrahydrocannabinol concentration of one percent or less by weight.

Appellee's App. at 13. Before passage of the amendments, the United States Attorney for South Dakota had notified the Tribe of the Drug Enforcement Agency's (DEA) position that the manufacture of hemp required a DEA Certificate of Registration (DEA registration) permitting the manufacture of marijuana. He also warned that anyone cultivating marijuana or hemp without one was subject to criminal prosecution.

Pursuant to the ordinance, and without a DEA registration, Alex White Plume raised a cannabis crop on federal trust land in 2000. White Plume contracted to sell the crop to Tierra Madre, a hemp processing company. The government learned of the crop, obtained samples of it under a search warrant, and, pursuant to court order, destroyed it. The next year, Percy White Plume tried his hand at growing cannabis on federal trust land without a DEA registration, and told the government he was doing so. He was sent a DEA registration application, but it was never completed, and a registration was never issued. As earlier, the government destroyed the crop. That crop was under contract to be sold to another hemp processing company, Madison Hemp. Undaunted, in 2002, Alex White Plume planted yet another cannabis crop on federal trust land, and, equally undaunted, the government again took samples and discovered traces of THC. Instead of prosecuting the White Plumes, the government asked the district court to declare them in violation of the Controlled Substances Act (CSA) and to permanently enjoin them from manufacturing or distributing cannabis.

The district court found that the White Plumes had violated the CSA by cultivating, without a DEA registration, hemp, which the court held was included in the definition of marijuana under the CSA. It also found that the Treaty of Fort Laramie of 1868 (Treaty) did not preserve any right of the Tribe to grow cannabis.

-4-

Finally, the court determined that the classification of hemp as marijuana was not irrational and unconstitutional. The court ordered the White Plumes permanently enjoined from cultivating Cannabis sativa L. without a valid DEA registration.

## II.   DISCUSSION

Appellants argue the district court erred (1) by holding that industrial hemp is subject to the CSA, (2) by finding that the Treaty does not grant the Tribe the right to cultivate hemp, and (3) by failing to find that regulating hemp under the CSA constitutes a due process and equal protection violation.[2]

### A.    Industrial Hemp Is Subject to the CSA

The CSA makes it illegal to manufacture, distribute, dispense, or possess any controlled substance except as authorized by the CSA. 21 U.S.C. §§ 841(a)(1), 844(a). A controlled substance is anything listed in a schedule under the CSA. Id. at § 802(6). A person who proposes to engage in the manufacture or distribution of a controlled substance must obtain a registration (DEA registration) issued by the attorney general pursuant to regulations established by that office. Id. at §§ 822-824; 21 C.F.R. §§ 1301 et seq. The CSA establishes five "schedules" of controlled substances differentiated by the scheduled drugs' potential for abuse, usefulness in medical treatment, and potential consequences if abused. To be placed on Schedule I, a drug or substance must have a "high potential for abuse," must have "no currently accepted medical use in treatment in the United States," and there must exist "a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1). "Marihuana" (marijuana) and "tetrahydrocannabinols" (THC) are both listed on Schedule I. Id. at § 812(c)(Schedule I)(c)(10), (17).

---

[2]Appellants did not develop an equal protection argument on appeal, so we do not address that issue.

-5-

Appellants first argue that the hemp the White Plumes attempted to farm is not "marijuana." Section 802(16) defines marijuana as "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin." Excepted from the definition are

> the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16). Appellants argue that the court ignored evidence that industrial hemp and marijuana are really different species of Cannabis, and that the drug "marijuana" that Congress sought to regulate in the CSA is Cannabis indicus. But Congress clearly defined "marijuana" as Cannabis sativa L. in the CSA. "'We are persuaded that Congress adopted "Cannabis sativa L." believing it to be the term that scientists used to embrace all marihuana-producing Cannabis; the other named sorts were not seen as separate Cannabis species.'" United States v. Gavic 520 F.2d 1346, 1352 (8th Cir. 1975) (quoting United States v. Honneus, 508 F.2d 566, 575 (1st Cir. 1974)). See New Hampshire Hemp Council, Inc. v. Marshall, 203 F.3d 1, 3 (1st Cir. 2000) ("[B]oth the drug commonly known as marijuana and various industrial products (*e.g.,* rope) derive from different portions of the plant popularly called the hemp plant and designated *Cannabis sativa* in the Linnaean system of botanical classification.").

In support of their argument that Congress did not intend to regulate industrial hemp, Appellants also assert that while the definition of "marijuana" in the modern CSA was carried forward from the Marihuana Tax Act of 1937 (Tax Act), which the CSA replaced, the Tax Act's practical effect of excluding industrial-use portions of the plant from regulation by not taxing them, was not carried forward. As a result,

Appellants argue, Congress unintentionally subjected industrial hemp to regulation under the CSA. They cite Hemp Council for a bit of history to support this assertion.

The definition of "marijuana" under the CSA is derived from the Tax Act, 50 Stat. 551, Hemp Council, 203 F.3d at 7, and uses identical language as that used in the Tax Act.

> The term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or resin; but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

50 Stat. 551 § 1(b). The practical effect of the Tax Act, however, was to treat industrial-use and drug-use marijuana differently by taxing them at different rates, or not at all.

> All producers of cannabis sativa and certain legitimate users (*e.g.,* doctors) were subject to a small tax, ($1 per year), Marihuana Tax Act § 2(a), 50 Stat. at 552; *see also* S. Rep. No. 75-900, at 4, but no tax was applied to transfers of the *mature* stalk of the plant, which is useful only for industrial use, S. Rep. No. 75-900, at 4, and which was specifically excluded from the definition of "marijuana," Marihuana Tax Act § 1(b), 50 Stat. at 551. By contrast, to discourage "illicit" uses, an extremely high tax ($100) applied to *each* transfer of other parts of the plant to anyone who had not registered with the government and paid his own occupational tax. Marihuana Tax Act §§ 6, 7(a)(2), 50 Stat. at 553-54. . . . Transfers that did not comply were made criminal. Id. §§ 4, 8, 12, 50 Stat. at 553, 555, 556. *See generally* S. Rep. No. 75-900; *Smith v. United States*, 269 F.2d 217, 218-20 (D.C. Cir.), *cert. denied*, 361 U.S. 865, 80 S.Ct. 130, 4 L.Ed.2d 108 (1959).

Hemp Council, 203 F.3d at 7.  When Congress passed the CSA, it adopted the Tax Act's definition of marijuana verbatim.  But since the CSA abandoned the Tax Act's complex tax scheme in favor of criminal sanctions (which could be avoided by a DEA registration), as a way to regulate marijuana production and distribution, the CSA now criminalized the growing of marijuana whether it was intended for industrial-use or drug-use.

> While in 1937 Congress had indicated in legislative history that production for industrial uses would be protected (primarily by a relatively low tax), *see* S. Rep. No. 75-900, at 4; *Smith*, 269 F.2d at 218-20, we can find no indication that Congress in 1970 gave any thought to how its new statutory scheme would affect such production. … Congress' main vehicle for protecting industrial-use plant production in 1937 was not its basic definition of "marijuana," which included plants ultimately destined for industrial use; it was the complex scheme of differential tax rates and other requirements for transfers. That is the regime that was drastically modified in 1970 in favor of a broad criminal ban (subject only to federal licensing), a ban which read literally embraces production of cannabis sativa plants regardless of use.

Id.  Given the legislative history of the Tax Act and the CSA's adoption of its definition of marijuana, Appellants' argument that Congress did not intend to criminalize the growing of marijuana for industrial purposes is plausible, but ultimately not persuasive, for we are bound by the language of the CSA.  If the language of a statute is unambiguous, the statute should be enforced as written unless there is clear legislative intent to the contrary.  United States v. Milk, 281 F.3d 762, 766 (8th Cir. 2002).  The language of the CSA unambiguously bans the growing of marijuana, regardless of its use, and unlike the situation with the Tax Act, we find no evidence that Congress intended otherwise.

> The possibility remains that Congress would not have adopted the 1970 statute in its present form if it had been aware of the effect on cultivation

of plants for industrial uses. But that is only a *possibility* and not a basis for reading the new statute contrary to its literal language, at least absent a clear indication that Congress intended to protect plant production for industrial use as it existed under the prior tax statute.

Hemp Council, 203 F.3d at 7 (citation omitted). We agree with the First Circuit. Essentially, what Appellants seek from this court is amendment of the CSA. But the proper venue for amending a statute is, of course, the duly elected legislature, equipped as it is to make those policy decisions.

"We as judges of the U.S. Court of Appeals have only the power to interpret the law; it is the duty of the legislative branch to make the law. We must refuse to infringe on the legislative prerogative of enacting statutes to implement public policy. The problems of public policy are for the legislature and our job is one of interpreting statutes, not redrafting them."

Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1033 (8th Cir. 2003) (quoting Welsh v. Boy Scouts of Am., 993 F.2d 1267, 1270-71 (7th Cir. 1993)).

Appellants also argue that hemp is distinguished from marijuana because it contains virtually no THC, making it incapable of having a high potential for abuse as required by the CSA for a drug to be included on Schedule I. In Hemp Council, a case similar to this one, the appellant proposed to grow industrial hemp. He argued that Congress had not intended to regulate non-psychoactive (low THC) Cannabis sativa (that portion of the plant used for industrial products). The court held that though at "some stage" Cannabis sativa may contain such low levels of THC that it would be impractical to use as a drug, "problems of detection and enforcement easily justify a ban broader than the psychoactive variety of the plant." Hemp Council, 203 F.3d at 6.

The plain language of the CSA states that Schedule I (c) includes "any material . . . which contains *any quantity* of [THC]," (emphasis added) and thus such material is regulated. Appellants point to a pair of Ninth Circuit cases which hold that Congress meant to regulate only materials containing *any quantity* of *synthetic* THC, and not *natural* THC (of which hemp contains trace amounts). "'[I]f naturally-occurring THC were covered under THC, there would be no need to have a separate category for marijuana, which obviously contains naturally-occurring THC.'" Hemp Indus. Ass'n. v. DEA, 357 F.3d 1012, 1014 (9th Cir. 2004) (Hemp II) (quoting Hemp Indus. Ass'n v. DEA, 333 F.3d 1082, 1089 (9th Cir. 2003) (Hemp I)). In Hemp II, appellants manufactured and sold food and cosmetic products made from hemp seed and oil. They did not *grow* Cannibas sativa. They challenged a DEA rule seeking to regulate any product that contains any amount of natural or synthetic THC. The court held that the DEA could regulate

> foodstuffs containing natural THC if it is contained within marijuana, and can regulate synthetic THC of any kind. But they cannot regulate *naturally-occurring* THC *not* contained within or derived from marijuana–i.e., non-psychoactive hemp products–because non-psychoactive hemp is not included in Schedule I. The DEA has no authority to regulate drugs that are not scheduled, and it has not followed procedures required to schedule a substance.

Hemp II, 357 F.3d at 1018.

The reasoning of Hemp II does not help Appellants because the case is distinguishable. The White Plumes were *growing* Cannabis sativa, from which hemp is ultimately derived, but from which "psychoactive" marijuana is also derived. Thus, even according to Hemp II, the White Plumes' *farming* of hemp is regulated by the CSA because it is marijuana *at some point* in the farming operation, containing natural THC. By contrast, the appellants in Hemp II did not grow marijuana, but manufactured products using imported hemp which, though containing natural THC, was not, at the time they possessed it, *part of a marijuana plant*. Indeed, in Hemp I,

-10-

the court acknowledged that "[t]he industrial hemp plant itself, which falls under the definition of marijuana, *may not be grown in the United States*. Therefore, the seeds and oil must be *imported*." 333 F.3d at 1085 n.2 (emphasis added). See Hemp Council, 203 F.3d at 7 n.6 ("Of course, stalks and fiber can still be possessed, *see Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 355, 104 S.Ct. 1837, 80 L.Ed.2d 356 (1984) (noting that hemp fibers are not grown in the United States but can be imported), but that is because of the explicit carve-out contained in the statute . . . .").

Because the CSA does not distinguish between marijuana and hemp in its regulation, and because farming hemp requires growing the entire marijuana plant which at some point contains psychoactive levels of THC, the CSA regulates the farming of hemp.

**B.      The Treaty of Fort Laramie of 1868 Does Not Grant a Treaty Right to Farm Hemp**

Appellants further argue that the Treaty gives the White Plumes a right to grow hemp. The Treaty between the United States and the Tribe provided in part that if any head of a family within the Tribe wished to farm, the government would provide them with a tract of land, as well as seeds and agricultural implements for the first year. Appellants assert that because hemp was either grown by Indian tribes or its cultivation was being encouraged by the United States government at the time of the signing of the Treaty, language guaranteeing farming support to the Tribe means the Treaty contemplated all kinds of farming, including hemp. Regardless of the historical accuracy of the assertion that the federal government encouraged hemp growing when the Treaty was signed, the plain language of the treaty merely refers to "farming"–it mentions nothing about farming *hemp*. Indian treaties are to be interpreted liberally in favor of Indians, and any ambiguities are to be resolved in their favor. Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 200 (1999).

The record does not support an assertion that the Treaty is ambiguous as to whether it contemplated the growing of hemp by the Tribe.

Under statutory interpretation, a statute is ambiguous if it is "'capable of being understood in two or more possible senses or ways.'" Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001) (quoting Webster's Ninth New Collegiate Dictionary 77 (1985)). The language of the Treaty as written is not ambiguous on the matter of farming hemp because the Treaty is not written in the context of permitting the cultivating of particular crops. Rather, the Treaty simply provides for government assistance should members of the Tribe choose to farm. Given that the CSA prohibits the cultivation of marijuana without a DEA registration, and given that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country," the White Plumes may not cultivate hemp without a DEA registration, and the Treaty does not reserve any such right. 18 U.S.C. § 1152.

## C.     The CSA Does Not Violate Substantive Due Process

The Companies assert that the CSA violates substantive due process under either strict scrutiny or rational basis review. The government asserts that they did not make these claims below and so may not raise them for the first time on appeal. The record indicates that the Companies asserted in their Answer and Counterclaim that they could proceed against the DEA under the Administrative Procedure Act (APA) for "violation of the constitutional rights of Tierra Madre and Madison Hemp." Though the government's point that the Companies did not develop these arguments below is well-taken, we think what little they did raise is sufficient in this case for purposes of our appellate review.

The government also challenges the Companies' standing to bring the constitutional claims. To have standing, a party must show that it has suffered a

concrete and actual or imminent injury-in-fact, the injury is fairly traceable to the challenged action of the defendant, and it is likely that the injury can be redressed by the court. <u>McClain v. Am. Econ. Ins. Co.</u>, 424 F.3d 728, 731 (8th Cir. 2005). The Companies can show that they sustained injury by not receiving the products for which they contracted with the White Plumes. The government argues that any injury suffered by the Companies is not legally protected because it involves contracts with the White Plumes that are void for conspiring to violate the CSA. But that is the ultimate question to be decided by this court–whether the White Plumes' activities are regulated by the CSA, and by extension whether the Companies' contracts were valid. The government also argues that the Companies' injury cannot be redressed because they ask this court to assume a legislative role and find that hemp is not marijuana under the CSA. That is a characterization of the case that, while relevant in a broader sense, does not necessarily bear on the narrow question of redressability. We find that the Companies have sufficient standing in this case for purposes of raising these constitutional issues on appeal.

## 1.    Strict Scrutiny Does Not Apply

Though we find the constitutional issues preserved for appeal and the requisite standing satisfied, the Companies have a tough row to hoe. They ask this court to be the first to find that farming–and by extension, farming hemp–is a fundamental right subject to strict scrutiny protection under the Fifth Amendment Due Process Clause. In this regard, we are guided by the Supreme Court's own reticence to declare from the bench what is and what is not a "fundamental right."

> [W]e "ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever

-13-

we are asked to break new ground in this field," lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (second alteration in original) (citations omitted). The Supreme Court has not declared "farming" to be a fundamental right, and we decline to do so today. It follows that we also decline to declare "hemp farming" a fundamental right. Since we do not deal here with a fundamental right, we do not apply strict scrutiny to the due process question. Doe v. Miller, 405 F.3d 700, 710 (8th Cir. 2005).

## 2.    CSA Classification Is Not Arbitrary and Irrational

The Companies also assert that the CSA's regulation of hemp is not rationally related to a legitimate governmental purpose. Here, the Companies face the high hurdle of the rational basis test, which assumes the constitutionality of the statute at issue. See United States v. Fogarty, 692 F.2d 542, 547 (8th Cir. 1982). In Fogarty, this court addressed an argument that the CSA's classification of marijuana as a Schedule I drug was unconstitutionally irrational and arbitrary because marijuana, it was argued, does not meet the criteria for Schedule I drugs–as relevant here, that it did not have a high potential for abuse. We noted that "'the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" Id. (quoting New Orleans v. Dukes, 427 U.S. 297, 303 (1976)). We held that the ongoing debate about the physical and psychological effects of marijuana and whether it had any medicinal value was a sufficiently rational reason for Congress to include marijuana on Schedule I. Id. at 547-48.

The Companies argue that Fogarty is distinguishable because the scheduling of the *drug* marijuana was challenged in that case, whereas the scheduling of "industrial hemp" is challenged in the instant case. The First Circuit faced a similar argument in

-14-

Hemp Council, and we agree with its reasoning that found at least one rationale for regulating hemp under the CSA. "It may be that at some stage the plant destined for industrial products [hemp] is useless to supply enough THC for psychoactive effects. But problems of detection and enforcement easily justify a ban broader than the psychoactive variety of the plant." 203 F.3d at 6. Since categorizing marijuana, be it for drug- or industrial-use, as a Schedule I substance passes muster under the rational basis test, the CSA does not violate the Companies' due process rights.

## III. CONCLUSION

We are not unmindful of the challenges faced by members of the Tribe to engage in sustainable farming on federal trust lands. It may be that the growing of hemp for industrial uses is the most viable agricultural commodity for that region. And we do not doubt that there are a countless number of beneficial products which utilize hemp in some fashion. Nor do we ignore the burdens imposed by a DEA registration necessary to grow hemp legally, such as the security measures required by the regulations. See 21 C.F.R. §§ 1301 et seq. But these are policy arguments better suited for the congressional hearing room than the courtroom. Today we fulfill our role to interpret and apply the statute as written by Congress, and affirm the district court.

_____