Mark LUNDY, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

NO. 2015–CA–000451–MR

Court of Appeals of Kentucky.

JANUARY 27, 2017; 10:00 A.M.

Modified: March 3, 2017; at 10:00 A.M.

BRIEF AND ORAL ARGUMENT FOR APPELLANT: C. Thomas Hectus, Louisville, Kentucky

BRIEF FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Bryan D. Morrow, Assistant Attorney General, Frankfort, Kentucky

ORAL ARGUMENT FOR APPELLEE: Bryan D. Morrow, Assistant Attorney General, Frankfort, Kentucky

BEFORE: COMBS, THOMPSON AND VANMETER,[1] JUDGES.

## OPINION

THOMPSON, JUDGE:

A Nelson Circuit Court jury found Mark Lundy guilty of possession of marijuana and possession of drug paraphernalia and, after the penalty phase, recommended a total sentence of twelve-months' incarceration and a $5,000 fine. A final judgment of conviction was entered in accordance with the jury's recommended sentence.

Mark alleges the following errors: (1) there was no consent to the search of a freezer and outbuilding located on his property; (2) the searches of a locked freezer and an outbuilding were beyond the scope of the search warrant and the items seized were not in plain view in violation of the Fourth Amendment; (3) he was entitled to a directed verdict of acquittal because the Commonwealth failed to prove the plant material seized from his residence met the definition of marijuana in Kentucky Revised Statutes (KRS) 218A.010(22); and (4) he was entitled to a

jury instruction defining hemp. We conclude that consent is not an issue because the search was pursuant to a valid search warrant and within its scope. We also conclude that Mark was not entitled to a directed verdict and that there was no error in the instructions.

Mark was shot at his residence by his wife, Jill Lundy.[2] Mark fled the residence in his truck in an effort to get to a hospital. In the meantime, Jill called 911 and reported the incident. Following a search of the residence by law enforcement officers and the discovery of marijuana on the premises, Mark was indicted on various felony charges including cultivating and trafficking marijuana, five or more pounds. He was also charged with misdemeanor offenses of possession of marijuana and drug paraphernalia.

Mark filed a motion to suppress the evidence seized during the search of his residence. At a suppression hearing, the trial court heard testimony from Nelson County Deputy Sheriff Brian Voils, Nelson County Sheriff Department Detectives Jason Allison and Jonathon Snow, Detective Mike Watts of the Greater Hardin County Narcotic Task Force and Jill.

On April 21, 2014, Jill telephoned the Nelson County 911 dispatcher and reported she shot Mark at their residence located at 7451 Woodlawn Road in Bardstown. She informed the dispatcher that she shot at Mark five times and left the .38 revolver on the kitchen table. Jill then waited on the front porch for officers to arrive.

Voils and Nelson County Deputy Sheriff Kevin Cox responded to the call. Voils testified that upon his arrival, Jill identi-

---

1. Judge Laurance B. VanMeter concurred in this opinion prior to being elected to the Kentucky Supreme Court. Release of this opinion was delayed by administrative handling.

2. Jill was charged with assault and pleaded guilty to assault under extreme emotional distress.

fied herself as the shooter and told him the .38 revolver was on the kitchen table. According to Voils, when Voils told her he needed to enter the residence to secure the weapon, Jill responded by stating "fine." He entered the residence and found an unloaded .38 revolver on the kitchen table. He then went outside to wait for detectives to arrive. Jill denied that she consented to Voils's entry into the residence.

Snow arrived and Voils informed him that a firearm was on the kitchen table. Snow then contacted Allison who agreed to obtain a search warrant.

In the affidavit for a search warrant, Allison stated that he received information Jill reported to 911 she shot Mark and, when law enforcement arrived at the scene, stated she shot Mark because he was coming at her with a wine bottle. The affidavit further stated that Snow observed blood outside in the parking area and on the door.

A search warrant was issued permitting law enforcement officers to search the premises at 7451 Woodlawn Road, Bardstown, Kentucky, described as a "[t]an metal building with attached garage and awning with red metal roof and out building." The warrant authorized the officers to seize "firearms and ammunition, firearm accessories, shell casings, projectiles, wine bottles and any blood evidence."

Upon executing the warrant, in the kitchen, officers discovered marijuana, scales, and scissors, which appeared to have been used to cut marijuana. Several bags of marijuana were also found in a locked deep freezer in the garage. The officers then proceeded to an outbuilding located approximately five parking spaces from the garage.

Allison obtained access to the outbuilding by using his driver's license to unlock the door. During the search, officers observed light emanating from beneath a board on the floor and, after removing the floor board, observed what appeared to be an indoor marijuana grow operation. At that point, the Greater Hardin County Narcotic Task Force was called. Snow, Allison and the other Nelson County Sheriff Department officers proceeded to collect evidence related to their shooting investigation.

Watts and other officers of the Task Force responded to the scene without obtaining a separate warrant to search for and seize any drugs. Upon arrival, the Task Force officers were informed of the drug paraphernalia and marijuana found in the kitchen, garage freezer, and outbuilding. A total of 385 marijuana plants were found in the outbuilding, 12.6 pounds of marijuana was found in the freezer, along with a bag of seed. The Task Force officers seized those items and continued to conduct their own search.

A bag of mushrooms was found in a cabinet and additional marijuana in the refrigerator. The Task Force also removed a computer, lawnmowers, 4–wheelers, paint sprayers, boats and trailer as goods purchased with drug proceeds and a safe from the bedroom. After obtaining a search warrant for the safe, the Task Force officers found pills, an unknown substance, and additional firearms inside.

The circuit court found that Jill consented to the entry into the residence for the purpose of securing the weapon used to shoot Mark based on its finding that Voils's testimony was the more credible than Jill's. It also rejected Mark's contention that the search conducted by the Sheriff's Department exceeded the scope of the warrant.

The trial court found that the items specified in the warrant were relevant to law enforcement's shooting investigation

and the warrant expressly permitted law enforcement to enter the premises, garage, and outbuilding. It further found that ammunition and shell casings were small items which could be placed in containers such as drawers, boxes and freezers. Consequently, the marijuana and drug paraphernalia found by the Nelson County Sheriff's Department were not suppressed.

However, the trial court ruled that once the law enforcement officers' search for evidence relevant to the shooting investigation was complete, the search should have ceased. It concluded that the Task Force's search of the premises without an additional search warrant was unconstitutional and all evidence discovered and seized by the Task Force in the second search was suppressed.

■ We apply different standards of review to the trial court's factual findings and to its legal conclusions. "A more deferential standard of review applies to the trial court's factual findings than to its legal conclusions[.]" *Payton v. Commonwealth*, 327 S.W.3d 468, 471 (Ky. 2010). As explained in *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky. App. 2002) (footnotes omitted):

> An appellate court's standard of review of the trial court's decision on a motion to suppress requires that we first determine whether the trial court's findings of fact are supported by substantial evidence. If they are, then they are conclusive. Based on those findings of fact, we must then conduct a *de novo* review of the trial court's application of the law to those facts to determine whether its decision is correct as a matter of law.

■ Consent is an exception to the warrant requirement of the Fourth Amendment of the United States Constitution and Section Ten of the Kentucky Constitution. *Hallum v. Commonwealth*, 219 S.W.3d 216, 221 (Ky.App. 2007). Mark contends

that even if Jill consented to Snow's initial entry into the residence to secure the weapon used to shoot Mark, she did not consent to the search of the locked freezer or outbuilding. His argument is not well taken.

Snow did not search the premises upon his initial entry. He merely entered the home, secured the weapon, and returned outside. The search that revealed the marijuana was pursuant to a warrant, the validity of which Mark does not dispute. Therefore, on that basis alone, we reject any argument that this case presents an issue of a warrantless search based on consent.

■ Although this was not a warrantless search, a search pursuant to a warrant is not necessarily constitutional. Under the Fourth Amendment, a search pursuant to a warrant cannot exceed the scope of the warrant.

■ The Fourth Amendment states in part: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized.*" (emphasis added). Not only must the warrant state with particularity the place to be searched and the person or things to be seized, but the Fourth Amendment requires that the warrant be executed in accordance with those specifications. General searches are prohibited as is the "seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Berger v. New York*, 388 U.S. 41, 58, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967) (quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)). "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant re-

quirement, the subsequent seizure is unconstitutional" and the evidence excluded. *Horton v. California*, 496 U.S. 128, 140, 110 S.Ct. 2301, 2310, 110 L.Ed.2d 112 (1990).

■■■ The scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982). The *Ross* Court held that a lawful search is not "limited by the possibility that separate acts of entry or opening may be required to complete the search." *Id.* at 820–21, 102 S.Ct. at 2170–71. The Court provided examples:

> Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for [marijuana] would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

*Id.* at 821, 102 S.Ct. at 2171. An otherwise valid search is transformed into an impermissible general search only where the searching officers demonstrate a "flagrant disregard for the limitations of a search warrant[.]" *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985).

These same principles have been applied in Kentucky law. In *Hazel v. Commonwealth*, 833 S.W.2d 831 (Ky. 1992), the officer had a search warrant to search Hazel's property for marijuana and cocaine and, during the search, discovered photos in a drawer of the defendant performing sexual acts with a minor. Our Supreme Court upheld the search citing *Ross* because it was reasonable for the officer to believe that illegal drugs could be in the drawer. *Id.* at 833–34.

This Court applied the same reasoning in *Evans v. Commonwealth*, 116 S.W.3d 503 (Ky.App. 2003). Officers obtained a warrant for Evans's apartment to search for "[c]ocaine, notes, letters, writings, documents, recordings, photos, monies, drug paraphernalia, or whatever type drug, presence of which may tend to indicate the illegal use of, possession of, or trafficking in a controlled substance[.]" *Id.* at 505. While searching, the officers found a locked fireproof safe and pried it open. Evans moved to suppress the illegal drugs and the digital scales found in the safe on the basis that the safe did not fall within the scope of the warrant. The trial court denied the motion and this Court affirmed. Pivotal to the *Evans* decision was the reasonableness of the officer's action. "It [was] obvious that the contraband specified in the search warrant could fit inside the safe and it was reasonable for the officers to search inside the safe for such contraband." *Id.* at 507.

■■■ The warrant issued to search Mark's premises authorized officers to search for "firearms and ammunition, firearm accessories, shell casing, projectiles, wine bottles and any blood evidence" in the home, garage and outbuilding. The items specified in the warrant were small in size and the officers were authorized to search anywhere those items might reasonably be found and unlock anything that

might contain those items. The trial court properly denied Mark's motion to suppress the marijuana found in the locked freezer and outbuilding.

Mark does not challenge that the officers were well within the scope of the warrant when they opened the kitchen cabinets to look for items related to the shooting. Their actions were reasonable and logical given that the weapon was found on the kitchen table.

 Mark next argues that he was entitled to a directed verdict because the Commonwealth failed to prove that he possessed marijuana and not hemp. The latter, he contends, is legal to possess in this Commonwealth.

Hemp and marijuana are visually indistinguishable and derive from different portions of the same plant, *Cannabis sativa.* "[T]he drug is derived from the flowers or leaves of the plant while the fibers used for rope and other industrial products are taken from the stalk." *New Hampshire Hemp Council, Inc. v. Marshall,* 203 F.3d 1, 3 (1st Cir. 2000). Although hemp and marijuana contain tetrahydrocannabinol (THC), plants grown to produce marijuana contain a much higher level of THC than those grown for industrial products. Thus, while marijuana has historically been used for its psychoactive effect, hemp has been used in industrial products since as early as the 1600s. *See* Christine A. Kolosov, *Evaluating the Public Interest: Regulation of Industrial Hemp Under the Controlled Substances Act,* 57 UCLA L. Rev. 237, 238 (2009). Hemp was so commonly used to make paper products and rope that "[t]he first drafts of the United States Constitution and the Declaration of Independence were both penned on hemp paper[.]" *Id.*

Despite its industrial uses and value as an agricultural crop, hemp was ultimately criminalized under federal and state law.

The origins of its criminalization under federal law is found in the "Marihuana Tax Act of 1937," which "was to treat industrial-use and drug-use marijuana differently by taxing them at different rates, or not at all." *United States v. White Plume,* 447 F.3d 1067, 1071 (8th Cir. 2006). When the Controlled Substances Act was enacted by Congress in 1970, the Tax Act was repealed in favor of criminalizing the growing of marijuana. *Id.* at 1072. However, the Tax Act's definition of marijuana was adopted verbatim criminalizing "the growing of marijuana whether it was intended for industrial-use or drug-use." *Id.* That same definition is contained in the current version of the Controlled Substances Act.

Under the Controlled Substances Act, marijuana is defined as follows:

The term [marijuana] means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802 (16).

Kentucky followed the same course as the federal courts and criminalized hemp by including hemp in the definition of marijuana. In *Commonwealth v. Harrelson,* 14 S.W.3d 541, 547 (Ky. 2000), the Court held that "[t]he legislature was well within its authority to designate and define *all parts* of the plant cannabis sp. as a controlled

substance." The Court reasoned that the 1992 definition of marijuana that included hemp was "a specific response to a serious and growing concern of the public and the legislature regarding illegal drug activities in Kentucky." *Id.* The Court noted that the legalization of hemp was properly a matter for the General Assembly. *Id.* at 550. Well over a decade later, the General Assembly enacted legislation that, to an extent, made growing hemp legal in this Commonwealth.

Until 2013, despite its industrial uses and economic benefits to farmers seeking to replace the tobacco industry in Kentucky, it remained illegal for any person to grow hemp. However, with the enactment KRS 260.855, this Commonwealth embarked on reviving the hemp industry. Under that statute, an individual may grow hemp if an industrial hemp grower license is obtained pursuant to KRS 260.854. A license holder "may sell industrial hemp produced by the grower to any person engaged in agribusiness or other manufacturing for the purpose of processing or manufacturing that industrial hemp into hemp products." KRS 260.855(1). KRS 260.854 provides for two separate forms of license:

a) An industrial hemp research program grower license, to allow a person to grow industrial hemp in this state in a controlled fashion solely and exclusively as part of the industrial hemp research program overseen by the commission. This form of licensure shall only be allowed subject to a grant of necessary permissions, waivers, or other form of valid legal status by the United States Drug Enforcement Agency or other appropriate federal agency pursuant to applicable federal laws relating to industrial hemp; and

(b) An industrial hemp grower license, to allow a person to grow industrial hemp in this state for any purpose. This form of licensure shall only be allowed subject to the authorization of legal industrial hemp growth and production in the United States under applicable federal laws relating to industrial hemp.

The statutory definition of marijuana was amended to exclude industrial hemp. KRS 218A.010(22) now states that "the term 'marijuana' does not include: (a) Industrial hemp as defined in KRS 260.850[.]"

Unfortunately, the definition of industrial hemp is not expressly provided for in KRS 260.850. It states that industrial hemp means "all parts and varieties of the plant cannabis sativa, cultivated or possessed by a licensed grower, whether growing or not, that contain a [THC] concentration of no more than that adopted by federal law in the Controlled Substances Act, 21 U.S.C. secs. 801 et seq." KRS 260.850(6)(a). Therefore, the definition of marijuana in KRS 218A.010(22) is based on the definition of industrial hemp in KRS 260.850 which, in turn, is based on the definition of marijuana under the Controlled Substances Act.

Presumably, with Kentucky and other states joining in the effort to revive the hemp industry, our General Assembly believed that the Controlled Substances Act would be amended to exclude plants with a designated level of THC from the definition of marijuana. That assumption proved to be wrong. Consequently, in 2013, a person could be licensed to grow and sell hemp under Kentucky law but, in theory, be criminally liable under the literal interpretation of the federal and state Controlled Substances Acts. Although it is unfathomable that our General Assembly intended to license a person to grow hemp knowing that the license holder would be subject to federal prosecution,

for a period of time, that was the situation.

Faced with the interest in reviving hemp as a national agricultural crop, Congress enacted the Agricultural Act of 2014.

7 U.S.C. § 5940(a) provides:

Notwithstanding the Controlled Substances Act (21 U.S.C. 801 et seq.),[ the Safe and Drug-Free Schools and Communities Act (20 U.S.C. 7101 et seq.),] chapter 81 of Title 41, or any other Federal law, an institution of higher education (as defined in section 1001 of Title 20) or a State department of agriculture may grow or cultivate industrial hemp if—

(1) the industrial hemp is grown or cultivated for purposes of research conducted under an agricultural pilot program or other agricultural or academic research; and

(2) the growing or cultivating of industrial hemp is allowed under the laws of the State in which such institution of higher education or State department of agriculture is located and such research occurs.

The statute continues and defines the term "industrial hemp" as "the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 5940(2).

As observed in *New Hampshire Hemp Council, Inc.*, 203 F.3d at 8, "new laws are often like jigsaw puzzles whose pieces do not quite fit; some have to be squeezed into place and there may be gaps in the pattern." There are undeniably gaps in new laws regarding hemp production and older laws regarding marijuana production. Admittedly, the puzzle would not be so difficult to complete if the Controlled Substances Act had been expressly amended to exclude industrial hemp from the broad definition of marijuana. However, we conclude that the Agricultural Act of 2014 fits into the legal frame-work.

The Act's opening phrase, "[n]otwithstanding the Controlled Substances Act," amended the Controlled Substances Act to the extent that marijuana no longer includes industrial hemp with a THC of not more than .3 percent. When pieced together, the Controlled Substances Act, the Agricultural Act of 2014, KRS 218A.010(22) and KRS 260.850 define industrial hemp as the plant Cannabis sativa L. having no more than a .3 percent THC level. 7 U.S.C. § 5940(2).

Based on our construction of the federal and state law, we agree with Mark that if the plants he possessed contained less than .3 percent THC, he possessed hemp and not marijuana. However, our holding does not mean that Mark was entitled to a directed verdict.

In *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991), the Court set forth the standard for granting or denying a directed verdict motion:

On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

While the level of THC distinguishes marijuana plants from hemp plants under federal and Kentucky law, that distinction is only relevant if Mark could legally pos-

sess industrial hemp. Under Kentucky law, he could do so only if properly licensed and engaged in growing hemp or possessing hemp for industrial use. No such evidence was presented. If the facts were different and Mark could legally possess industrial hemp plants or was in possession of a commercial hemp product containing THC, we would agree that the Commonwealth must establish the THC level in the plants or the product was more than .3 percent. That simply is not the case.

Moreover, there was more than sufficient circumstantial evidence that the plant material was marijuana. *See Graves v. Commonwealth*, 17 S.W.3d 858, 862 (Ky. 2000). Plants were found in an indoor grow operation in an outbuilding cellar, a highly unusual place to grow hemp but consistent with illegally growing marijuana. There was testimony that the bud from the marijuana plants was found in the freezer, a practice known to preserve the THC level. There was also testimony that while cloning solution was found in the outbuilding, hemp growers are not concerned with whether the plants are male or female. Based on the evidence, the trial court properly denied the motion for directed verdict.

Mark's final contention is that he was entitled to a jury instruction defining industrial hemp. "Instructions must be based upon the evidence and they must properly and intelligibly state the law." *Howard v. Commonwealth*, 618 S.W.2d 177, 178 (Ky. 1981). The purpose of instructions "is ... to state what the jury must believe from the evidence ... in order to return a verdict in favor of the party who bears the burden of proof." *Webster v. Commonwealth*, 508 S.W.2d 33, 36 (Ky. 1974). "Although a trial judge has a duty to prepare and give instructions on the whole law of the case, ... that duty does not require an instruction on a theory with no evidentiary foundation." *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998) (internal citations omitted).

As discussed above, unless Mark was a licensed grower or could otherwise possess industrial hemp, any difference between the definition of marijuana and industrial hemp was not relevant to the jury's inquiry. Absent some evidentiary foundation that Mark was a licensed industrial hemp grower or a manufacturer of hemp products, the trial court properly denied the requested instruction. We find no error in the instructions.

Based on the foregoing, the judgement of the Nelson Circuit Court is affirmed.

ALL CONCUR.