# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JANUARY 20, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0496-MR

DAVID CORBIN                                                         APPELLANT

|     | ON APPEAL FROM ADAIR CIRCUIT COURT |
| --- | --- |
| V.  | HONORABLE SAMUEL TODD SPALDING, JUDGE |
|     | NOS. 19-CR-00097 & 19-CR-00102 |

COMMONWEALTH OF KENTUCKY                                             APPELLEE

**MEMORANDOM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

David Corbin appeals as a matter of right[1] his convictions of fleeing or evading in the first degree, wanton endangerment in the first degree (three counts), and possession of marijuana. Following a careful review of the record and applicable law, we affirm.

### I. Factual and Procedural Background

In April 2019, David Corbin returned to his home and discovered that his wife, Michelle, had placed all his possessions on their porch and locked the front door. Included in Corbin's possessions were five marijuana plants, which he had been growing in the house. Corbin attempted to convince Michelle to

---

[1] Ky. Const. § 110(2)(b).

open the door but when she refused the couple began shouting at each other through the entryway. Eventually Michelle called the police and Corbin left the residence in a 2001 black Ford Explorer, which belonged to Michelle.

Shortly thereafter, deputies from the Adair County Sheriff's Department responded to Michelle's 911 call. While the deputies were still at the house, Corbin began sending Michelle a series of text messages which read:[2]

- U dirtywhore u gonna wish u never touched my goddamn plants u will wish u was dead

- It's a good day to die bitch

- Show that to the lawweall can go together I give no ducks I got another pistol bitch

- U took allu taking of mine give it back or I'm gonna get very nasty that's your last warn g thief

- U gonna get me killed today goddamn who know who else over your fucking whore shit its [good] day to die bitch I'm ready

- Give me my gun I pass u on by

- U thief ass fucking trash u deserve all the bad u get can't leave well eno8ghalone little bitch could u

- Got me sks 4 30roundclips and my pistol

- goddamn all of u to hell

- Hey I come out dollar store u truck is gone

- Igotgroceryiesman damn

- Somebody stole it

---

[2] According to the photo taken by the Adair County Deputy, these text messages were sent between 2:48 PM and 5:02 PM on April 5, 2019, the day of the incident. We have left the messages exactly as they appear in the record.

2

After leaving Michelle's home, Deputy Josh Durbin attempted to find Corbin. While driving, Durbin spotted a black Ford Explorer which matched Michelle's description and began following the vehicle. Durbin radioed for support and was joined by Sergeant Murphy. The two officers then attempted to pull the vehicle over. When Corbin, who both officers identified as the driver of the vehicle, refused to pull over Sergeant Murphy attempted to get in front of the vehicle and force him into a rolling stop. After the maneuver failed, the now four deputies in pursuit followed Corbin down a series of roads and onto a dirt path in the woods. All the vehicles involved in the chase had to stop their pursuit at this point because the road had become unnavigable. Only Sergeant Murphy, who was driving an SUV, attempted to follow Corbin down the dirt path. However, the chase ended quickly when Sergeant Murphy's SUV became stuck.

That evening, a group of four officers continued their search for Corbin on foot. While hiking the woods, the officers spotted a lit cigarette, which was quickly followed by the churn of an engine as a vehicle drove towards them. Trooper Bale, who was involved in the original pursuit, later identified the vehicle as the same Explorer involved in the first chase. Sheriff Brockman, who was not involved in the original chase but who has known Corbin since grade school, yelled for the vehicle to stop. Although the vehicle briefly slowed down, it quickly drove forward again, forcing the officers off the dirt path. Sheriff Brockman testified that the driver of the vehicle was Corbin. Later that

evening, officers found the vehicle abandoned in a field. Several days later, Corbin was located at a motel in an adjacent county and arrested.

Following his arrest, a grand jury indicted Corbin on nineteen charges, the most serious of which included: first-degree fleeing or evading; first-degree wanton endangerment (five counts); cultivation of marijuana; first-degree illegal possession of a controlled substance; and being a first-degree persistent felony offender.[3] The trial court granted directed verdicts of acquittal on the charges of disregarding a stop sign, improper passing, and first-degree criminal mischief. Prior to the final judgment, the trial court vacated two of the first-degree wanton endangerment convictions, with respect to Deputy Durbin and Officer Cravens. The trial court then sentenced Corbin to twenty years imprisonment.

## II. Standard of Review

To properly preserve a motion for directed verdict the defendant must, among other elements, "identify the particular charge the Commonwealth failed to prove, and must identify the particular elements of that charge the Commonwealth failed to prove." *Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020); CR[4] 50.01. Corbin concedes that his general motions for a directed

---

[3] Additionally, Corbin was charged with first-degree criminal mischief; speeding 26 mph or greater; disregarding a stop sign; reckless driving; improper passing; and third-degree terroristic threatening.

[4] Kentucky Rules of Civil Procedure.

4

verdict failed to meet this requirement and thus requests palpable error review

pursuant to RCr[5] 10.26.

> Under RCr 10.26, an unpreserved error may generally be noticed on appeal *if* the error is palpable and *if* it affects the substantial rights of a party. Even then, relief is appropriate only upon a determination that manifest injustice resulted from the error. For an error to rise to the level of palpable, it must be easily perceptible, plain, obvious and readily noticeable.

*Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013) (internal quotations

omitted). Manifest injustice is present when a "defect in the proceeding [exists

that is] shocking or jurisprudentially intolerable." *Martin v. Commonwealth*,

207 S.W.3d 1, 4 (Ky. 2006). Consequently, we will find palpable error when the

defendant suffers a "manifest injustice, either through the probability of a

different result or error so fundamental as to threaten a defendant's

entitlement to due process of law." *Jones v. Commonwealth*, 331 S.W.3d 249,

256 (Ky. 2011) (internal quotation marks omitted).

### III. Analysis

#### A. Fleeing or evading in the first degree.

Corbin's first claim involves the charge of fleeing or evading in the first

degree. Under KRS[6] 520.095(1), a person is guilty of fleeing or evading police

in the first degree,

> (a) When, while operating a motor vehicle with intent to elude or flee, the person knowingly or wantonly disobeys a direction to stop his or her motor vehicle, given by a person recognized to be a police officer, and at least one (1) of the following conditions exists:

---

[5] Kentucky Rules of Criminal Procedure.

[6] Kentucky Revised Statutes.

> 1. The person is fleeing immediately after committing an act of domestic violence as defined in KRS 403.720[.]

Domestic violence, in turn, is defined in KRS 403.720(1) as "physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]" Corbin argues that he was entitled to a directed verdict of acquittal on this charge because his text messages, by themselves, do not qualify as domestic violence pursuant to KRS 403.720(1).

When, as here, we are confronted with a question of statutory interpretation, that is, whether Corbin's text messages satisfied KRS 403.720(1)'s definition for domestic violence, "[o]ur primary goal is to discern the intent of the General Assembly, and we discern that intent, if at all possible, simply from the language the General Assembly chose[.]" *Ballinger v. Commonwealth*, 459 S.W.3d 349, 354 (Ky. 2015). In doing so, "[w]e have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 648 (Ky. 2017) (quoting *Cosby v. Commonwealth*, 147 S.W.3d 56, 59 (Ky. 2004)). Therefore, if the language of the statute is clear, our inquiry must end because "we assume that the '[Legislature] meant exactly what it said, and said exactly what it meant.'" *Id.* (quoting *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005)).

Applying these principles, the Commonwealth did not allege any history of domestic abuse, nor did it assert that any physical violence occurred on the

6

day of the text messages. Consequently, the only portion of the definition of domestic violence which Corbin could have met was an "infliction of fear of imminent physical injury [or] serious physical injury[.]"

Despite Corbin's assertions regarding the lack of imminency in his threats to Michelle, the Commonwealth presented sufficient evidence to survive a motion for a directed verdict. When Corbin arrived home, and found his belongings on the front porch, he yelled at Michelle, and, as she stated in her testimony, he threatened her through the doorway.[7] When Michelle still refused to open the door, Corbin began assaulting it, prompting Michelle to dial 911. Crucially, Corbin did not relent until Michelle had called the police. Moreover, even after Corbin left the house he continued to threaten Michelle. For the next several hours Corbin texted Michelle messages such as: "U took allu taking of mine give it back or I'm gonna get very nasty that's your last warn g thief," "give me my gun I pass you on by," and "got me sks 4 30 roundclips and my pistol." The specificity and rancor of Corbin's text messages satisfies KRS 503.010(3)'s definition for "imminent"[8] because Corbin placed Michelle in ongoing fear of death or serious physical injury all the while being sought by the Adair County Sheriff's Department. Since Corbin's threats were

---

[7] During Michelle's testimony, she stated that Corbin's text messages to her after he had left the house largely reflected the language he used while still at the house.

[8] KRS 503.010(3) defines "imminent" as an "impending danger," which this Court has acknowledged as synonymous with "[a]bout to occur at any moment." *Lickliter v. Commonwealth*, 142 S.W.3d 65, 71 (Ky. 2004). The Oxford American Dictionary also defines imminent as "about to occur, likely to occur at any moment." *Imminent, Oxford American Dictionary*, 327 (1980).

7

imminent, his conduct is properly classified as domestic violence under KRS 403.720(1). Accordingly, the trial court did not err by denying Corbin's motion for a directed verdict of acquittal on the first-degree fleeing or evading charge.

### B. Wanton endangerment in the first degree.

Corbin's second claim is that the trial court committed palpable error by denying his motions for directed verdict on three counts of wanton endangerment in the first degree. Those charges, and the resulting jury convictions, stem from Sergeant Murphy's police pursuit of Corbin down a wooded dirt path where Sergeant Murphy's car bottomed out in a mud pit; and Troopers Bale and Brockman's search for Corbin in those same woods that night, during which Corbin's vehicle forced the troopers off the dirt road. Since Corbin failed to properly preserve the argument, we review only for palpable error.

KRS 508.060(1) requires the Commonwealth to prove that Corbin "under circumstances manifesting extreme indifference to the value of human life, [] wantonly engage[d] in conduct which create[d] a substantial danger of death or serious physical injury to another person." To have acted wantonly, Corbin needed to have been "aware of and consciously disregarde[d] a substantial and unjustifiable risk" with the risk being "of such nature and degree that disregard thereof constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation." KRS 501.020(3). Finally, the "serious physical injury" referenced in KRS 508.060(1) is defined as a "physical injury which creates a substantial risk of death, or which causes

8

serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." KRS 500.080(15).

Both parties rely heavily on our recent decision in *Culver v. Commonwealth*, 590 S.W.3d 810 (Ky. 2019). In that case, this Court upheld the trial court's denial of Culver's motion for a directed verdict on a first-degree wanton endangerment charge stemming from his behavior during a police chase. *Id.* at 818. In *Culver*, we noted that, generally, we consider the "manner in which a vehicle is operated and the conditions under which that vehicle is operated" in determining whether the defendant's conduct created a "substantial risk." *Id.* at 817. Therefore, in addition to the defendant's speed, we consider other factors, such as: whether the defendant disobeyed stop signs and red lights; whether the weather was inclement; whether it was dark; and whether the defendant put other vehicles or pedestrians in danger, either by forcing them out of his way, or because the chase occurred in a congested area, such as a school zone or shopping center. *Id.* We concluded that the Commonwealth presented sufficient evidence on the wanton endangerment charge because the chase occurred at night, the roads were narrow and winding, Culver's speed was excessive, driving as much as 25 m.p.h. above the posted speed limit and causing the officers to fear for their lives. *Id.*

**1. Sergeant Murphy.**

We begin our analysis by noting that although Sergeant Murphy was the only officer to pursue Corbin down the dirt path, Deputy Durbin and Officer

Cravens were also involved in the initial pursuit. The Commonwealth charged Corbin with three counts of wanton endangerment in the first degree, one for each officer involved. At trial, the Commonwealth presented evidence that Corbin exceeded the speed limit, at times by nearly 20 m.p.h, down winding country roads and highways, that he passed vehicles in prohibited zones and that he riskily evaded police attempts to bring him to a halt. The jury convicted Corbin on all three counts, but the trial court vacated instructions 5(a) and 8(a), which referred to Deputy Durbin and Officer Cravens because the court regarded the testimony as insufficient to establish an elevated risk. However, the court allowed the conviction with regards to Sergeant Murphy to remain. Unlike the other two officers, Sergeant Murphy was involved in the initial attempt to "box" Corbin in and bring him to a stop, as well as the only vehicle to pursue Corbin down a dirt path meant for ATV's and not large vehicles. Consequently, Sergeant Murphy's risk throughout the pursuit was different from either Deputy Durbin or Officer Cravens, whose role the trial court described as merely "following" Corbin. Taken in conjunction with Corbin's other behavior throughout the chase, the trial court properly ruled that the Commonwealth presented sufficient evidence to present the jury with the first-degree wanton endangerment instruction as it related to Sergeant Murphy.

### 2. Trooper Bale and Sheriff Brockman.

After being forced to abandon their initial pursuit, the officers prepared to search for Corbin on foot. That night, several officers, including Trooper

10

Bale and Sheriff Brockman, walked the same road down which Corbin had escaped.  Eventually the two officers came across the Black Explorer, finding Corbin inside smoking a cigarette.  Immediately, Corbin started the vehicle and began driving directly towards the officers.  Sheriff Brockman testified that he shouted at Corbin to stop, which apparently caused Corbin to slow his vehicle initially.  However, Corbin ultimately decided not to comply and forced the officers off the road.  Corbin asserts that his initial hesitation and lack of speed did not create a substantial risk of serious injury to the officers.  Corbin's argument misunderstands, entirely, our reasoning in *Culver*.  Even assuming Corbin's statements regarding speed are true,[9] speed is still only one among several factors we consider.  *Id.* at 817-18.  The facts here are simple and unmistakable.  Corbin, while facing two pedestrians, intentionally disregarded a police command to stop his vehicle and forced the officers off the road, causing them to fear for their lives.  His behavior clearly placed the officers' lives in danger.  As a result, we perceive no error by the trial court in denying Corbin's motion for a directed verdict regarding Trooper Bale and Sheriff Brockman.

### C. *Possession of marijuana.*

Next, we turn to Corbin's allegation that the Commonwealth did not present sufficient proof that the plants Michelle claimed to be Corbin's were

---

[9] However, because this is an appeal on a motion for a directed verdict, we would in fact accept the Commonwealth's assertions as true because it is the non-moving party.  *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

11

marijuana plants. During trial, Corbin moved for a directed verdict of acquittal on the cultivation of marijuana charge, which the trial court denied.[10] Following the Commonwealth's offer of proof, the trial court instructed the jury on both the cultivation charge, as well as the lesser-included offense of possession. The jury returned a verdict finding Corbin guilty of possession but acquitting him of the cultivation charge.

In Corbin's own words:

> The Commonwealth presented evidence of potting trays, fluorescent lights, reflective panels, and a magazine called Maximum Yield. A deputy sheriff testified that he saw stalks that looked and smelled like marijuana. Appellant does not dispute there was evidence of intent to grow marijuana inside Michelle Corbin's house. What the Commonwealth failed to prove was whether the grower had any success.

Corbin's essential assertion is that the Commonwealth's failure to have the plants tested was a fatal error. We disagree.

As Corbin's own brief concedes, our Court of Appeals has answered this question recently, concluding that circumstantial evidence was sufficient to support a finding that the plants in question were marijuana. In *Lundy v. Commonwealth*, the Commonwealth presented evidence that the plants were located in an outbuilding cellar which was consistent with illegal marijuana cultivation. 511 S.W.3d 398, 407 (Ky. App. 2017). Additionally, bud from the

---

[10] Some dispute exists about whether Corbin properly preserved this challenge because his original motion for a directed verdict concerned the cultivation charge and did not refer to the possession of marijuana charge. *See Benham*, 816 S.W.2d at 187 (establishing the standard for reviewing directed verdict motions). However, because the trial court did not err in denying Corbin's motion for a directed verdict, Corbin's appeal fails under either standard.

marijuana plants were found in the freezer, a known technique for preserving THC levels, which was also consistent with best practices for illegal marijuana operations. *Id.* Shortly thereafter, this Court, in an unpublished, but nearly identical opinion factually, cited *Lundy* approvingly. In *Despain v. Commonwealth*, police officers found nine marijuana plants while executing a search warrant on Despain's property. 2018-SC-0198-MR, 2019 WL 6972897, at *3 (Ky. 2019). Along with the plants, officers recovered grow lamps, a ventilation system, a marijuana grower's guidebook, as well as a scale and two packs of rolling papers. *Id.* Exactly as Corbin argues in this appeal, Despain asserted that the police's failure to have the plants chemically tested precluded a finding that the plants were in fact marijuana. *Id.*, at *4.

By its nature, marijuana is ubiquitous, and officers, such as Deputy Cross in this case, are trained to identify those plants. Although other substances, those with which officers perhaps have less exposure, may require chemical testing to be properly identified, marijuana plants are relatively distinctive, in both appearance and odor, especially to officers trained in their identification. Here, since Deputy Cross testified the plants were marijuana plants, that he observed the plants first hand, and that Michelle also testified that Corbin was growing marijuana in the basement, the trial court acted appropriately when it denied Corbin's motion for a directed verdict.

13

### D. *Relevance and undue prejudice.*

Lastly, Corbin claims that the testimonies of Michelle Corbin and Trooper Begley fail KRE[11] 401, 402, 403, and 404's requirements for relevance and undue prejudice.

The core of admissibility resides in KRE 401, 402 and 403. KRE 402 states "[a]ll relevant evidence is admissible, except as otherwise provided[.]" Relevant evidence means "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. KRE 403 provides the trial court with latitude to exclude otherwise relevant evidence because the "probative value is substantially outweighed by the danger of undue prejudice[.]" However, as we stated in *Probus v. Commonwealth,* "[t]he inclusionary thrust of the law of evidence is powerful, unmistakable, and undeniable, one that strongly tilts outcomes toward admission of evidence rather than exclusion." 578 S.W.3d 339, 347 (Ky. 2019) (citation omitted). Indeed, "KRE 403 is carefully calculated to leave trial judges with extraordinary discretion in the application and use of [KRE 403]." *Id.* (citation omitted).

When, however, testimony concerns prior bad acts, KRE 404 operates as a limiting principle on admissibility, and, generally speaking, testimony regarding a prior bad act is inadmissible. *See* KRE 404(b) ("[E]vidence of other crimes, wrongs, or acts is not admissible in order to prove the character of a

---

[11] Kentucky Rules of Evidence.

14

person or in order to show action in conformity therewith[]").  For evidence of other bad acts to be admissible under KRE 404(b)(1), it must satisfy the three-part balancing test set forth in *Bell v. Commonwealth,* 875 S.W.2d 882 (Ky. 1994).  That test focuses on relevance, probativeness, and prejudice of the evidence: (1) Is the evidence relevant for some other purpose than to prove the criminal disposition of the accused? (2) Does it have probative value, *i.e.,* whether a jury could reasonably infer that the prior bad acts occurred and that the accused committed them? (3) Is its probative value substantially outweighed by its prejudicial effect?  *See id.* at 889–91.

Because Corbin failed to properly preserve his challenges, we review his claims only for palpable error under RCr 10.26.  Therefore, Corbin must show not only that the trial court committed an error, but also that he suffered a "manifest injustice, either through the probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Jones v. Commonwealth,* 331 S.W.3d 249, 256 (Ky. 2011) (internal quotation marks omitted).

### 1. Testimony suggesting Corbin was intoxicated.

At trial, the Commonwealth had the following exchange with Michelle regarding her interaction with Corbin at their home:

> C: What state of mind was [Corbin] in when he left?
>
> M: I assumed him to be wild. I don't know on what or how much or anything like that I just know he wasn't himself.
>
> C: You said he was wild, what do you mean by that?
>
> M: Intoxicated. Intoxicated on something.

15

C: What's your basis for saying that? You've seen him intoxicated before?

M: Yes.

C: On what?

M: Name it, I've seen him intoxicated on a lot of things. He's probably seen me as well, you know.

C: What did he appear to you to be under the influence of that day?

M: Maybe meth.

C: Do you believe that he was under the influence of methamphetamines that day?

M: I believe he was under the influence of something. It could have been pills, it could have been anything.

Corbin argues Michelle's testimony was unduly prejudicial because drug use is a felony in the Commonwealth, and any probative value was outweighed by the negative light her testimony cast on his character. The Commonwealth counters by stating that, at the time of Michelle's testimony, Corbin was charged with fleeing or evading in the first degree while being intoxicated under KRS 520.095(1)(a)2 and his state of mind, as well as whether he was under the influence, was probative and relevant to the charge. We agree with the Commonwealth. Further, Michelle's testimony was based on considerable personal experience with Corbin, including his erratic behavior during their exchange at the house, and was material to proving the first-degree fleeing or evading charge. Additionally, we note that even if the trial court should have struck the testimony from the record, the jury acquitted Corbin of the relevant charge. Corbin's ancillary argument that the jury's decision to recommend the maximum sentence on each of his convictions necessarily dictates a finding that Michelle's testimony was unduly prejudicial is similarly unpersuasive.

16

The Commonwealth presented a wealth of testimonial and direct evidence to support each of Corbin's convictions, and this short exchange between Michelle and the Commonwealth does not mar the jury's decisions or recommendations.

**2. Testimony regarding the unrelated warrant.**

Corbin's last allegation involves the testimony of Trooper Begley, which outlined the police procedures utilized to arrest him at the motel several days after he escaped from the police chase. Specifically, Corbin alleges that Trooper Begley impermissibly informed the jury that he originally went to arrest Corbin on an unrelated charge, and that, because of the threats Corbin made towards Michelle, the officers staged a trooper armed with a rifle across the parking lot from the motel. Trooper Begley further testified that, after speaking with Corbin through the door of his motel room, Corbin peacefully surrendered to police.

While we agree with Corbin that Trooper Begley's testimony regarding the unrelated warrant was irrelevant, its inclusion in his testimony was not palpable error. Given Corbin's text messages to Michelle, as well as the ensuing police chase in which he forced the officers off the road, the police had ample reason to take extra precautions in securing Corbin's capture. Moreover, given the weight of the evidence against Corbin, we do not believe that excluding any of the challenged testimony would have resulted in a different outcome at trial.

### IV. Conclusion.

For the foregoing reasons, we affirm Corbin's convictions and sentence.

17

All sitting.  All concur.


COUNSEL FOR APPELLANT:

Steven Jared Buck
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Kenneth Wayne Riggs
Assistant Attorney General